**SHELL OIL COMPANY, Petitioner,**

v.

**FEDERAL TRADE COMMISSION, Respondent.**

**The FIRESTONE TIRE & RUBBER COMPANY, Petitioner,**

v.

**FEDERAL TRADE COMMISSION, Respondent.**

**Nos. 18967, 18969.**

United States Court of Appeals
Fifth Circuit.

April 18, 1966.

Rehearing Denied May 18, 1966.

Geo. C. Schoenberger, Jr., New Orleans, La., William Simon, Washington, D. C., William F. Kenney, New York City, John Bodner, Jr., John H. Quinn, Jr., of Howrey, Simon, Baker & Murchison, Washington, D. C., for petitioner, Shell Oil Co.

Francis C. Mayer, Atty., F.T.C., J. B. Truly, Asst. Gen. Counsel, Alvin L. Berman, Atty., F.T.C., Washington, D. C., James McI. Henderson, Gen. Counsel, Lester A. Klaus, Atty., F.T.C., for Federal Trade Commission.

Cantey, Hanger, Gooch, Cravens & Scarborough, Fort Worth, Tex., amicus curiae for Champlin Oil & Refining Co. and others.

Thomas S. Markey, Washington, D. C., Cecil E. Munn, Fort Worth, Tex., Louis A. Gravelle, William W. Rayner, Washington, D. C., for the Firestone Tire & Rubber Co., John F. Floberg, Gen. Counsel, Paul L. Raish, Asst. Counsel, Akron, Ohio, of counsel.

Before BROWN and WISDOM, Circuit Judges, and JOHNSON, District Judge.

WISDOM, Circuit Judge:

This case is one of a trilogy of cases the Federal Trade Commission brought in January 1956 against (1) Atlantic Refining Company and Goodyear Tire and Rubber Company *(Atlantic-Goodyear)*, (2) Texaco (Texas) Company and Goodrich Tire and Rubber Company *(Texaco-Goodrich)* and (3) Shell Oil Company and Firestone Tire and Rubber Company

*(Shell-Firestone)*. In each complaint the FTC challenged the validity of a sales commission contract between the oil company and the rubber company, alleging that the contract was an unfair method of competition in violation of Section 5 of the Federal Trade Commission Act.[1]

As everyone who drives a car knows, service stations usually carry tires, batteries, and automobile accessories (TBA).[2] The most widely used plans for marketing TBA are the (1) purchase-resale and (2) sales commission systems. Under the purchase-resale plan, the oil company purchases TBA from the manufacturers and resells the TBA to its service station dealers and wholesale distributors. Under the sales commission plan, the manufacturers sell TBA directly to the oil company's dealers and wholesalers. This system is based on a contract: In return for promoting sales of the rubber company's TBA the oil company receives an overall commission (override)[3] on all the supplier's TBA sold at the oil company's wholesale and retail outlets. Shell, Texas Company, and Atlantic use the sales commission system.[4] They contract

1. "Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce are hereby declared unlawful." Federal Trade Commission Act, § 5(a) (1), 66 Stat. 632; 15 U.S.C. § 45(a) (1).

2. Since World War II, service stations have become increasingly important as TBA outlets. Their large number, the convenient location of the usual station, the availability of TBA for immediate installation at a station, and the possibility of the "single stop" at one station for all automotive needs contribute to the still rising importance of gasoline service stations as market outlets for TBA. Shell's evidence indicates that in 1958 about 45 per cent of all TBA was sold through service stations, a figure representing an estimated increase of 14 per cent in ten years. Shell estimates that in 1955 about 50 per cent of the sales of replacement tires was made through service stations.

3. Shell receives 10 per cent of the gross sales made by Firestone to Shell dealers and 7½ per cent of the gross sales to Shell jobbers. To simplify bookkeeping, each Shell dealer is assigned to a specific Firestone wholesale "supply point". Since Shell sells no TBA itself, the Commission accurately, if pejoratively, terms these payments an "override".

There is a spirited difference between the parties as to whether the commission represents compensatory payments or a windfall. One ancient intra-company letter dating from 1947 suggests that the payments were "almost all net profit". In 1956 Shell received about $3.6 million in commissions from Firestone and Goodyear. If indeed this sum represented "almost all net profit" it was a healthy profit for a company that allegedly entered the TBA jungle only to insure its market position in the sale of gasoline and other petroleum products. However, uncontradicted evidence of Shell's promotional costs in 1956 demonstrates that the commission payments were no windfall. Shell's promotional activities in 1956 cost $3.2 million, leaving it with a mere $400,000 profit from TBA, a negligible sum considering the magnitude of its petroleum enterprises. Shell estimated the costs as follows:

| | |
|---|---:|
| Credit costs for the use of credit cards and deferred payment plan | $ 500,000 |
| Maintenance, repairs, and depreciation or displays and promotional equipment | 600,000 |
| Promotion and advertising | 2,225,000 |
| Total | $3,325,000 |

Strangely, this accounting does not even include the cost of personnel involved in TBA promotion. This cost was estimated at $1,875,000 for 1956 and would have raised Shell's TBA costs to $5,260,000, or $1,600,000 in excess of its commission revenue. There is of course no way of knowing in dollar and cents the extent to which Shell's TBA program promoted its sales of gasoline. Shell was satisfied with its program; at any rate, it preferred that program to any other.

4. In order to offer a sales commission plan, a tire manufacturer must be able to offer a complete line of TBA to its service station customers; those items which it does not manufacture must be purchased and stocked (usually under its own private brand name). Furthermore, the company must have distributive facilities at least as widespread as are the dealers of its customers. This means a national distribution system. Only four, possibly three, tire manufacturers (Goodyear, Firestone, Goodrich, and, possibly, U. S. Rubber) satisfy these requisites.

with Firestone, Goodrich, and Goodyear, the three largest TBA suppliers, and with other tire and rubber companies; Shell, for example, has a sales commission contract with Goodyear as well as with Firestone.

The same examiner heard all three cases. In each case he found that the sales commission plan was lawful [5] but that in certain instances the oil companies had used overt coercive tactics.[6] The Commission adopted the findings of overt coercion. More importantly, in *Atlantic-Goodyear* and *Shell-Firestone* the Commission ruled that, considering the "competitive effects resulting from respondent's use" of the sales commission system, the system itself was an "unfair method of competition". The novelty in these rulings was the Commission's rationale:[7]

"Shell has sufficient economic power over its wholesale and retail distributors to cause them to purchase substantial amounts of sponsored TBA *even without the use of overt coercive tactics*. For reasons set forth hereinafter, we conclude that the exercise of this power by Shell through the use of the sales commission plan in favor

---

They are dominant in the area of sales commission plans. But the smaller companies, as well as the giants, may participate in purchase-resale plans whereby the oil companies assemble their own TBA package. Most of the tire manufacturers, and here Firestone is a notable exception, do in fact participate to some extent in purchase-resale programs.

The gasoline market is a rough-tough competitive struggle pitting a few giants struggling against each other and against a large number of pigmy producers. In this context the purchase-resale and the sales commission programs work in opposite directions. To enter into a purchase-resale program, an oil company must have resources large enough to finance an extensive TBA inventory. It must also have sales and distributive facilities for marketing these products. And, of course, the oil company must have an established reputation for quality, if it seeks to market TBA under a private label. As a result, the small companies prefer the less burdensome sales commission plans; the giants, notably Standard Oil, are capable of purchasing and reselling a complete line of TBA under their own brand names. In *Atlantic* the Supreme Court expressly refrained from passing on the merits of the purchase-resale plan.

The amicus curiae brief of Champlin Oil & Refining Co. (concurred in by Ashland Oil & Refining Company, Continental Oil Company, Jenney Manufacturing Company, Inc., Leonard Refineries, Inc., Shell Oil Company, South Penn Oil Company, and Sunray D-X Oil Company makes the point that "virtually every marketing oil company in the United States provides a TBA program for the benefit of its marketing outlets". Champlin and other small or relatively small companies use the sales commission plan

because it enables them to provide the necessary TBA program without having to invest in a large TBA inventory. Champlin avows that a *per se* approach to the problem will force it to use the purchase-resale system, make unnecessary demands on its capital, and place it at a disadvantage in competing with large oil companies having a nationwide system of distribution.

5. The examiner found as to Shell: "No inference or implication can be drawn simply from the contractual relationship between Shell and its dealers that the degree of control by Shell over its dealers is sufficient to force dealers to purchase only sponsored TBA."

6. The examiner found that there was "no evidence" that Firestone "participated" in any coercive practices. But as to Shell: "Shell representatives * * * did * * * force Shell dealers to purchase substantial quantities of Goodyear and Firestone TBA * * * [by] demands that dealers discontinue the purchase or display of non-sponsored TBA under threat of lease cancellation or other corrective action."

7. Courts have looked with disfavor on arrangements by oil companies to sponsor TBA, but until *Atlantic-Goodyear* no court had gone further than to enjoin overt coercive acts. Osborn v. Sinclair Refining Co., 4 Cir. 1960, 286 F.2d 832 cert. denied, 1961, 366 U.S. 963, 81 S.Ct. 1924, 6 L.Ed.2d 1255; United States v. Sun Oil Co., E.D.Pa.1959, 176 F.Supp. 715. But see Simpson v. Union Oil Co., 1964, 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed. 2d 98 and Broussard v. Socony Mobil Oil Company, 5 Cir. 1965, 350 F.2d 346 viewing the dealer-oil company relationship as inherently coercive. See also Note, 63 Mich.L.Rev. 713 (1965).

of Firestone (Goodyear) constitutes an unfair method of competition and an unfair act or practice in commerce within the meaning of Section 5 of the Federal Trade Commission Act." (Emphasis added.)

March 9, 1961, in *Shell-Firestone,* the Commission issued broad orders prohibiting Shell's using coercion in marketing TBA; outlawing the oil company's use of the sales commission plan with Firestone or "any other rubber company or tire manufacturer, or any other [TBA] supplier"; and outlawing the rubber company's use of the plan with Shell or any other oil company. Similar orders were issued in *Atlantic-Goodyear.* Goodyear Tire and Rubber Company, 58 F.T.C. 309; Firestone Tire and Rubber Company, 58 F.T.C. 309.

In *Texaco-Goodrich,* unlike the companion cases, the 1961 Commission reached a result the 1966 Commission described as "enigmatic":[8] "[Although] 'Texaco has sufficient economic power over its wholesale and retail petroleum distributors to cause them to purchase substantial amounts of sponsored TBA even without the use of overt coercive tactics', *the record did not contain 'sufficient market data to enable the Commission to assess the competitive effects of the sales com-* *mission method of distributing TBA'."* (Emphasis added.) The Commission therefore remanded the case to the hearing examiner for the taking of additional evidence on that issue.[9] B. F. Goodrich, 58 F.T.C. 1176. On remand, the examiner found that the Texaco-Goodrich plan was unlawful; the Commission entered orders identical with those entered in the two companion cases. (*B. F. Goodrich,* Docket 6485, April 15, 1963).

When these cases reached the courts, the Seventh Circuit affirmed the Commission in *Atlantic-Goodyear* [Goodyear Tire & Rubber Co. v. Federal Trades Comm.] 1964, 331 F.2d 394; the District of Columbia Circuit reversed the Commission in *Texaco-Goodrich*[10] and ordered the complaint dismissed, 1964, 336 F.2d 754. The Supreme Court granted certiorari in both cases. This Court withheld its decision pending final action by the Supreme Court in the companion cases. In *Atlantic-Goodyear* the Court affirmed the judgment. Atlantic Refining Company v. Federal Trade Commission, 1965, 381 U.S. 357, 85 S.Ct. 1498, 14 L.Ed.2d 443; reh. denied 382 U.S. 873, 86 S.Ct. 18, 15 L.Ed.2d 114. In *Texaco-Goodrich* the Court vacated the judgment with instructions that the case be remanded to the Commission for further proceedings, "in light" of Atlantic.[11]

8. Opinion on remand in Texaco-Goodrich, FTC Docket 6485, Jan. 14, 1966.

9. In remanding the case to the examiner, the Commission said:

"The determination of whether Texaco's exercise of such economic power in favor of Firestone and Goodyear under the oil company's sales commission contracts with these rubber companies constitutes an unfair method of competition depends, therefore, upon *the competitive effects* of these sales commission contracts; not upon whether Texaco has exercised its power to implement such contracts through the use of overt coercive tactics, or by more subtle, but equally effective, means. * * * Whether the sales commission agreements between Firestone and Texaco and Goodrich and Texaco are unlawful must depend, therefore, upon the characteristics and the competitive effects of these sales commission agreements. For reasons set forth hereinafter, we conclude that this case must be remanded in order that market data may be introduced to show the competitive effects of Texaco's sales commission agreements with Goodrich and Firestone upon competing suppliers of tires, batteries and accessories at the manufacturing, wholesale and retail levels." 58 F.T.C. 1176.

10. *Texaco-Goodrich* also involved the question whether the Chairman of the Commission was disqualified from participating in the decision because he had indicated in a speech made while the case was pending that he had prejudged it. The Court dismissed the case because the Commission's orders were not supported by the record and because of the undue protraction of the administrative process.

11. And without the participation of the Chairman of the Commission.

Federal Trade Commission v. Texaco, Inc., 1965, 381 U.S. 739, 85 S.Ct. 1798, 14 L.Ed.2d 714.

The parties differ widely in their understanding of *Atlantic.* The respondent asserts that under *Atlantic,* a TBA sales commission contract is unlawful *per se;* the petitioners assert that the Supreme Court decided *Atlantic* not on any generalized theory of *per se* illegality but on specific findings of fact supported in that case by substantial evidence. The petitioners' contention serves as the predicate for their argument that the facts here are unlike the controlling facts in *Atlantic-Goodyear;* the orders against Shell and Firestone should be set aside for lack of substantial evidence; in the alternative, this Court should remand the proceeding to the Commission for further consideration.

On the record before us, the difference between the two interpretations of *Atlantic* may be more verbalistic than real. Even assuming the correctness of the petitioners' interpretation and even admitting that there are some differences between the Atlantic-Goodyear system and the Shell-Firestone system, the controlling facts in this case are so similar to those in *Atlantic* that the same result should be reached in both cases. The importance, however, of judicially declaring *or not* declaring a new category of *per se* violations affecting every oil company, every TBA supplier, and every car-owner requires the Court to give careful consideration to the factual background and to the conflicting contentions.[12]

### I.

A. In *Atlantic-Goodyear* and *Shell-Firestone* the Commission, using virtual-

ly identical language in the two opinions, found that the oil companies had exercised their economic power "to cause [their] dealers to purchase substantial amounts of a different class of products, TBA, as a condition to their continuance as * * * lessees and dealers". This finding, "in conjunction with their 'market position and the volume of TBA affected, would bring them within the Supreme Court's ruling in Northern Pacific Ry. Co. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958) and the more recent decision in Osborn v. Sinclair Refining Co., 4 Cir. 1960, 286 F.2d 832' ". And, as the Commission noted, "The Court held in the *Northern Pacific* case that tying arrangements are *per se* violative of Section 1 of the Sherman Act 'whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the tied product' and a 'not insubstantial' amount of interstate commerce is affected". The Commission looked to *Osborn,* a case involving an implied tie-in, for the content of the phrase "sufficient economic power". Comparing Sinclair Refining Company, the oil company in *Osborn,* with Shell and Atlantic, the Commission found that these two companies had "sufficient economic power" in the tying commodity—petroleum products— to bring the case within the doctrine of tying arrangements. At that point in the opinion one would have to conclude that the Commission regarded the sales commission system as a tying arrangement *per se* illegal [13] on a showing of the oil company's requisite economic power in the tying product.

Precisely at this point in both opinions, however, the Commission broke new ground with the statement: "But we do

---

12. The Supreme Court excepts from its ruling oil companies able to show that they are "not possessed of economic power over their dealers". 381 U.S. at 377–378, 85 S.Ct. at 1510. The nature and extent of this exception is of course beyond the scope of this opinion.

13. "It is generally agreed that tying arrangements are illegal *per se.* While examination of a particular tying arrange-

ment is not limited to the characterization of the practice, as has traditionally been the case with price fixing and group boycotts, judicial inquiry is nevertheless confined to the determination of a single fact: the amount of commerce affected in the tied product." Pearson, Tying Arrangements and Antitrust Policy, 60 N.W.L.Rev. 626 (1965).

not rest our decision on a mechanical application of the rule of the *Northern Pacific* and *Osborn* cases". Abandoning the tie-in and overt coercion contentions, the Commission stated the issue as "the legality of a particular method of distributing TBA products used by the respondents". This issue, the Commission said, requires an examination and assessment of the anti-competitive effects of the oil company's use of its economic power by means of the sale commission method. In *Atlantic-Goodyear* therefore the Commission said:

> Atlantic has sufficient economic power with respect to its wholesale and retail petroleum distributors to cause them to purchase substantial quantities of sponsored TBA even without the use of overt coercive tactics or of written or oral tying agreements, and this power is a fact existing independently of the particular method of distributing or sponsoring TBA used by Atlantic. Determination of illegality in this context requires an evaluation of competitive effects resulting from the sales commission method of distributing TBA used by these respondents.

In view of this reasoning, the Commission's action in *Texaco-Goodrich* is not "enigmatic". Texas Company uses a TBA plan with Goodrich that is substantially the same as the Shell-Firestone and Atlantic-Goodyear plans. The Commission's

remand of *Texaco-Goodrich* carries the necessary implication that the Commission did not treat the sales commission arrangement as a tying scheme and did not condemn the system as *per se* illegal.[14] If it had, the remand would have been pointless. An "inquiry into effect upon competition * * * [would have been] irrelevant". White Motor Company v. United States, 1963, 372 U.S. 253, 265, 83 S.Ct. 696, 703, 9 L.Ed.2d 738. (Concurring opinion.)

B. When the TBA cases reached the circuit courts, General Counsel for the FTC took the flat position that the sales commission contract was illegal *per se*— as a tying arrangement and in itself.[15] In *Atlantic-Goodyear* the Seventh Circuit recognized that "Goodyear's contract with Atlantic in itself has no tying features", but "considered contextually with the oil company-dealer relationship and the economic power that Atlantic has over its dealers its tying features emerge". 331 F.2d at 402. The "tying arrangement *is* the sales commission system operated by Goodyear and Atlantic". Ibid. "The heart of this case is the economic power Atlantic possesses over its service station dealers. Ostensibly, they are independent buinessmen; but behind the legalistic facade of independence, there exists a servitude caused by the coercive pressures which Atlantic exerts upon its dealers." 331 F.2d at 400. In accepting more or

14. See footnote 9.

15. The complaint did not allege, in terms, a tying arrangement or a *per se* violation. Counsel for Shell asserts in his brief in this Court that during the trial neither theory was mentioned. The briefs filed with the examiner and, on appeal, with the Commission, do not discuss tying or *per se* arguments.

Mr. Justice Goldberg, in his dissent in Atlantic, said: "In short, the Commission opinions in this and the related cases are bathed in confusion and leave unanswered a number of questions necessarily involved in the decision of these cases. Are TBA sales-commission plans only unfair methods of competition if the oil company has used coercive tactics on its dealers? If they are illegal without past or present evidence of coercion, are they illegal for oil companies which do not

have the same relation with their dealers as Atlantic has with its dealers? Are they illegal for oil companies which do not have the same market position as Atlantic? Has the Commission drawn a distinction between sales commission and purchase-resale TBA promotion plans, condemning the former but approving the latter? If it has, is there a rational basis, consistent with the policies of § 5, for such a distinction? All of these questions appear to me to be inadequately answered by the Commission's opinion. * * * Moreover, if in these and the related cases the Commission is laying down the broad rule that all sales-commission TBA promotion arrangements in the oil industry are *per se* unfair methods of competition, such a rule has neither been clearly articulated nor supported with adequate economic analysis."

less completely the tying and *per se* arguments, the court seems to have shifted the emphasis from avoiding anti-competitive effects to protecting the dealers against exploitation by the oil company.[16]

The District of Columbia Circuit, on the other hand, held for Texaco and Goodrich. According to that court, the "keystone of the Commission's ultimate decision" was the "unwarranted assumption", for which there was "no basis in the record", that Texaco has "sufficient economic power over its dealers to compel them to handle Goodrich tires exclusively." 336 F.2d at 766.

C. As we read *Atlantic*, the Supreme Court approached only to the brink of holding TBA sales commission contracts *per se* unlawful. True enough, on the record before it, the Court might have held that the Atlantic-Goodyear distribution system, as distinguished from the bare contract, was a tacit but true tying arrangement.[17] But the Court, like the Commission in its 1961 decision, declined to classify the sales commission "arrangement" as a "tying scheme". And nowhere in the opinion can be found the words "per se". This could hardly have been an accident. The Court specifically said:

> "At the outset we must stress what we do not find present here. We recognize that the Goodyear-Atlantic *contract is not a tying arrangement. Atlantic is not required to tie* its sale of gasoline and other petroleum products to purchases of Goodyear tires, batteries, and accessories. Nor does it *expressly* require such purchases of its dealers. But neither do we understand that either the Commission or the Court of Appeals held that the sales-commission arrangement was a tying scheme." 381 U.S. at 369, 85 S.Ct. at 1506 (Emphasis added.)

"What the Commission and the Seventh Circuit did find" the Supreme Court said, "was that the central competitive characteristic was the same in both cases—the utilization of economic power in one market to curtail competition in another". (369, 85 S.Ct. 1506)

The rationale for the Atlantic decision may be broken down into three essential components,[18] each of which depends on the facts of the case before the court:

(1) the oil company's dominant economic power over its dealers;

(2) the exercise of that power over its dealers;

(3) the anti-competitive effects of using that power.

The first need not detain us. The Court determined that "there is 'warrant

---

16. One commentator has observed: "[A distinction should be drawn between] restraints of trade, which constitute clear public injury, with mere restrictions on the freedom of the dealer to act as an independent businessman. This is where the approach of the Seventh Circuit would seem to differ significantly from the approach of the Commission. The Commission accepted the fact that the oil companies enjoyed controlling economic power over their dealers but did not condemn its use as such; it condemned only the abuse of this power. Only when it resulted in anticompetitive effects did the Commission step in. By applying the tying arrangement analogy, the Seventh Circuit effectuated an important shift in emphasis from preventing anti-competitive effects toward protecting the dealers." Note, 63 Mich.L.Rev. 713, 719 (1965).

17. A tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product."

Northern Pac. Ry. v. United States, 1958, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545. TBA sold to dealers is tied to gasoline and oil or to the leasing of service stations, or to both. Goodyear's TBA sales, therefore, do not result from competition in the open market, but from Goodyear's purchasing a captive market. The lack of an express tie is unimportant; a tying arrangement may be found in a course of dealing between the parties. McElhenney Co. v. Western Auto Supply Co., 4 Cir. 1959, 269 F.2d 332. The Court has treated tying arrangements generally as *per se* violations of antitrust law because they necessarily restrict a buyer's freedom of choice between competing products in the market for tied products. See United States v. Loew's Inc., 1962, 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11; International Salt Co. v. United States, 1947, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20.

18. In its brief the Commission uses this breakdown to show that the Court applied tying principles.

in the record' for the findings of the Commission" as to Atlantic's economic powers. (368, 85 S.Ct. 1505) Atlantic, as "a major producer, refiner and distributor of oil and its by-products" (363, 85 S.Ct. 1503) and its dealers "simply do not bargain as equals". (368, 85 S.Ct. 1505) This power exists independently of any particular plan for distributing TBA.

Second, as is demonstrated by the success of the sales commission system, Atlantic exercised its economic power over its dealers by forcing them to sell sponsored TBA. The very purpose of the system was to exploit that power. As the Court observed: "[T]he Commission was well justified in concluding that Goodyear had in effect purchased a captive market." (375, 85 S.Ct. 1509) "It is difficult to escape the conclusion that there would have been little point in paying substantial commissions to oil companies were it not for their ability to exert power over their wholesalers and dealers * * * " (376, 85 S.Ct. 1509) Since "persuading" its dealers to buy Goodyear TBA was "a natural incident of [Atlantic's] power" (368, 85 S.Ct. 1506) proof of specific acts of overt coercion was not essential to the holding.

Atlantic did not seek review of that part of the Commission's order relating to overt acts of coercion. The Supreme Court however did not ignore the evidence of overt coercive acts. The Court noted that "utilization of economic power in one market to curtail competition in another" exists *here as in tie-ins, but here "that lever was bolstered by actual threats and coercive practices"*. (369, 85 S.Ct. 1506) (Emphasis added.) "The long existence of the plan itself, coupled with the coercive acts practiced by Atlantic pursuant to it, warranted a decision to require more" than enjoining the use of overt coercive tactics. Atlantic's overt coercion however was simply "symptomatic of a more fundamental restraint of trade". (361, 85 S.Ct. 1502) Successful operation of the TBA commission plan did not depend on overt coercion. It did not depend on any express provision in the sales commission contract compelling Atlantic to require its dealers to purchase Goodyear's TBA. To its dealers, Atlantic's wish was Atlantic's command.

The Supreme Court's action in *Texaco-Goodrich* clarifies the rationale in *Atlantic-Goodyear*. There the Court summarily vacated the judgment upon a petition for writ of certiorari raising the question of the legality of the sales commission system in the absence of any acts of overt coercion. The petition alleged: "Texaco has sufficient economic power over its wholesale and retail petroleum distributors to cause them to purchase substantial amounts of TBA *even without the use of overt coercive tactics*".

Third, in determining the anti-competitive effects, the Court noted that the Commission "looked to the entire record" and concluded that "the activity of Goodyear and Atlantic impaired competition at three levels of the tires, batteries and accessories industry." The Court went into considerable detail in showing Goodyear's close cooperation with Atlantic. It was "of little consequence that Atlantic actually applied the pressure". There "was ample evidence establishing on Goodyear's part a course of conduct lasting over 14 years aimed at utilizing oil company structures to curtail competition in tires, batteries and accessories". In affirming the Commission's order against Goodyear, the Court noted that the sales commission plan "enabled Goodyear to integrate its own nationwide distribution system with the economic power possessed by Atlantic over its wholesale and retail petroleum outlets". (373, 85 S.Ct. 1508).

In approving the breadth of the order the Court relied on the fact that Goodyear had contracts with 20 oil companies in addition to Atlantic. Nine of the contracts were before the Commission; all were similar to the Atlantic-Goodyear contract. "Upon considering the destructive effect on commerce that would result from the widespread use of these contracts by major oil companies and suppliers, we conclude that the Commission was clearly justified in refusing the participants an opportunity to offset

these evils by a showing of economic benefit to themselves." (371, 85 S.Ct. 1507) Goodyear complained that "there is no evidence of the economic power of many of the companies with which it has sales-commission plans". The Court did not discount this argument; it looked to the record:

> This order does not necessarily prohibit Goodyear from making contracts with *companies not possessed of economic power over their dealers.* The evidence in this particular record, however, does involve relationships such as it has enjoyed with Atlantic and *its propensity to use those relationships for an unfair competitive advantage.* Goodyear offered no evidence that it has arrangements differing from those mentioned in the instant case. * * * *On this record we cannot say that the Commission's remedy is unreasonable* * * *."* (377–378, 85 S.Ct. 1510) (Emphasis added.)

▮ The Court's approach in *Atlantic* is consistent with the broad scope of a Section 5 proceeding. Section 5 is intended to halt practices in their incipiency that may show promise of developing into violations of the Sherman and Clay-

ton Acts and to defeat practices not specifically proscribed by those laws but contrary to the principles animating the Sherman and Clayton Acts.[19] The approach is also consistent with the Court's usual reluctance to adopt a *per se* rule until it can be supported by a series of decisions.[20]

The door allowing escape to the rule of reason is ajar. At this stage in the development of anti-trust law applicable to TBA distribution plans of oil companies, courts may not adopt a doctrinaire approach. Courts must look to the record, at least to the extent the Supreme Court relied on the record in *Atlantic.*

## II.

The three essential elements on which the Supreme Court based its decision in *Atlantic-Goodyear* are present in *Shell-Firestone.*

A. First, Shell has dominant economic power over its dealers similar to Atlantic's power over its dealers. Shell too is a major integrated producer, refiner, and distributor of petroleum products. In 1955, when the record closed, Shell sold about 5 per cent of the total gasoline sold in the United States,[21] and had an-

---

19. " * * * [T]he words 'unfair practices' and 'unfair methods of competition' are not limited to precise practices that can readily be catalogued. They take their meaning from the facts of each case and the impact of particular practices on competition and monopoly." Pan American World Airways v. United States, 1963, 371 U.S. 296, 307, 83 S.Ct. 476, 483, 9 L.Ed.2d 325. See also Federal Trade Commission v. Motion Picture Advertising Service Co., Inc., 1953, 344 U.S. 392, 73 S.Ct. 361, 97 L.Ed. 426; Federal Trade Commission v. Cement Institute, 1948, 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010; Fashion Originators Guild of America v. Federal Trade Commission, 1941, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949; Federal Trade Commission v. Beech-Nut Packing Co., 1922, 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307. See also Oppenheim, Guides to Harmonizing Section 5 of the Federal Trade Commission Act With the Sherman and Clayton Acts, 59 Mich.L.Rev. 821 (1961).

20. "[The] cases also show that generally a restraint of trade in the past has been declared to be per se unlawful only after a cumulative series of rulings—adverse to

the practice—had given the courts a solid basis for arriving at *per se* condemnation. For example, tying arrangements had so frequently been found unreasonably to restrain trade that the courts finally declared that they hardly serve any purpose beyond the suppression of competition." Van Cise, The Future of Per Se in Antitrust Law, 50 Va.L.Rev. 1165, 1172 (1964). In White Motor Co. v. United States, 372 U.S. 253, 261, 83 S.Ct. 696, 9 L.Ed.2d 738, the Supreme Court reversed a district court which had developed a per se rule of antitrust liability without regard to the economics of the situation: "This is the first case involving a territorial restriction in a vertical arrangement; and we know too little of the actual impact of both that restriction and the one respecting customers to reach a conclusion on the bare bones of the documentary evidence before us."

21. The statistical picture is muddy. The Commission estimates that in 1955 about 34,795,000,000 gallons of gasoline were sold at retail in the United States. This figure is based on the total sales of gasoline (46,394,000,000 gallons) published by the Ethyl Corporation and the as-

nual operating revenues exceeding $1,-700,000,000.

In 1957 Firestone, the second largest tire manufacturer in the United States, sold 17 per cent of all replacement tires sold; Goodyear, the largest manufacturer, sold 24 per cent. Shell has had sales commission arrangements with Firestone and Goodyear since 1940; written contracts since 1951.

At the time the FTC hearings were held, Shell marketed its products in 41 states and the District of Columbia through a network of 23,000 service stations.[22] Shell had more than 10,000 di-

sumption that 75 per cent of the gasoline sold in the United States is sold at retail. In 1954 Shell sold 1,890,491,000 gallons of gasoline to service stations (about 5 per cent of the 1955 total) and it sold an additional 1,039,344,000 gallons to jobbers. There is no indication of how much of the gasoline sold to jobbers ultimately is sold at retail. (The Commission, in its opinion, seemed to indicate that all of this gasoline would be sold at retail. It also picked up the figure as 1.4 billion gallons instead of the proper 1.04 billion gallons. Nevertheless, the Commission finally found that Shell sold about 5 per cent of the national market, a figure that indicates the Commission's view that only the gasoline sold directly to retailers was considered relevant.) In addition to the gasoline sold to retailers and to jobbers, Shell sold 5,486,000 gallons of gasoline at stations Shell owned and operated. In light of the lack of certainty behind the statistical analysis, it is improper to be more specific than to say that in the years of 1954 and 1955 Shell supplied in excess of 5 per cent of the gasoline sold at retail in the United States.

22. Four different types of service station operators acquire their gasoline directly from Shell. (1) At one extreme are the *commission stations, designated as "C" stations.* These stations are owned by Shell and operated by managers who sell gasoline and petroleum products as commission agents. They are independent businessmen as to TBA and other products, except that they are restricted to selling "such merchandise as Shell may approve". (2) Next, there are *lessees, "L" dealers,* who rent their stations, including the pumps and tanks, from Shell. Ostensibly, "L" dealers are independent of their supplier-landlord. The leases are usually for one year and are automatically renewed; no cause is necessary for refusal to renew a lease at the end of its term (3) "DL" stations are similar to the "L" stations. *DL operators own their own stations,* but lease them to Shell. Shell, in turn, leases these stations back to their owners for the same period of time and at the same rental. This procedure is used for the purpose of providing collateral—the Shell lease—upon which the operator can borrow money to finance the construction or improvement of his station. In some cases Shell does this financing itself. The leases are for varying lengths of time and are automatically renewed from year to year after the initial period. (4) Finally, there are the other dealers, *"OD" dealers, who either own their own stations outright or lease them from some third party.* OD dealers purchase gasoline from Shell through yearly contracts (dealer sales agreements) terminable by Shell. Many OD stations are not gasoline stations as such, but are restaurants, garages, parking lots, or other businesses that incidentally have gasoline pumps. The TBA sales potential from an "OD" station is usually smaller than it is from other Shell outlets. In addition to selling through service stations, Shell sells through jobbers.

In 1955 Shell's direct outlets and their relative importance as purchasers of gasoline were as follows:

| | "C" | "L" | "DL" | "OD" | Total |
|---|---|---|---|---|---|
| Number of stations | 999 | 3910 | 1922 | 3231 | 10,062 |
| Percentage of the total for direct dealers | 9.9 | 38.8 | 19.1 | 32.2 | 100.0 |
| Percentage of gasoline sold to direct dealers (1.9 billion gallons) | 14.7 | 46.7 | 20.2 | 18.4 | 100.00 |

The picture of Shell's distributive system is completed by adding sales to 847 jobbers who supply, among others, about 13,000 retail gasoline stations, and the sales made by Shell in its few wholly owned and operated retail outlets. In 1955 Shell's sales to jobbers amounted to around 1.04 billion gallons; direct retail sales amounted to around 5 million gallons.

rect dealers; Atlantic had about 5,500 direct dealers.

The Supreme Court referred to three sources of an oil company's power over dealers: (1) control of the dealers' oil and gasoline supply; (2) control over dealers through short-term leases and equipment loan contracts renewable year-to-year and terminable at year's end upon ten days notice; (3) control over advertising on the premises of service stations. The first provides inherent leverage; the two others are "control devices" available to the oil company. The first two sources of power are unquestionably present in *Shell-Firestone*. The record is unclear as to the extent of Shell's control of advertising on the premises of its service stations although there is no doubt as to the close cooperation between Shell and Firestone in arranging the displays at Shell stations. Other sources of power are (4) the leverage when Shell finances a station or owns the site,[23] and (5) the control device of house-keeping requirements concerning the station's use, maintenance, and appearance which, if breached, could result in immediate cancellation of a lease without notice. Cf. Broussard v. Socony Mobil Oil Co., 5 Cir. 1965, 350 F.2d 346. In final analysis, the dominance of a major oil company over its dealers comes from the leverage inherent in the structure and economics of the petroleum distribution system and from the company's firm velvet-gloved grip on control devices.

B. Second, the record shows that in performing its obligations to the rubber company under the sales commission agreement, Shell, like Atlantic, did indeed use its economic power over its dealers to cause them to buy sponsored TBA.

The following acts of persuasion or promotion which the Supreme Court noted in its Atlantic opinion are matched by corresponding acts of Shell in the instant case:

Announcement to dealers of sponsorship of Goodyear TBA; suggestion to dealers that they maintain adequate stocks of sponsored TBA; maintenance of service station identification and advertising relating to Goodyear TBA; oil company salesman representation of, and assistance to, Goodyear in sponsored TBA promotions; maintenance by oil company of dealer training programs in sale of sponsored TBA; "double-teaming" solicitation of dealers; projection of dealer sponsored TBA quotas; assignment of each dealer to specified sponsored TBA supplier; reporting technique whereby oil company may determine exact amount of sponsored TBA purchased by each dealer; rubber company reporting to oil company of names of noncooperative dealers for appropriate action by oil company; advance notice to Goodyear supply points of identity of new selected Atlantic dealers.

Firestone makes the point that what the Supreme Court said in condemnation of Goodyear cannot be said of Firestone. Here the examiner found that there was "no evidence" that Firestone "engaged in, or participated in, any acts of practices designed to force dealers and dis-

---

23. The relatively heavy cost of constructing a modern service station accounts in part for the dealers' (retailers) high degree of financial dependence on major oil companies. In 1957 the average total cost of construction of a Shell station, including land costs, was $92,000. When an untrained man is accepted by Shell as a dealer, the usual procedure is to start him off as a commission agent. The C operators usually have no investment in the service station itself; they are responsible for furnishing any inventory of TBA. This, together with tools and equipment, means an investment of about from $3,000 to $7,000. C operators are completely dependent upon remaining in the good graces of their Shell employers; for any reason at all, Shell may change or remove a C dealer upon only twelve hours notice. After a C dealer is initiated into his operation, Shell often converts the station into an L station, thereby giving its operator a good deal more freedom and security along with considerably more financial responsibility. Personal investments in L and DL stations (exclusive of land) are usually between $5,000 and $15,000 on which $2,000 and $4,000 represents TBA inventory.

tributors of Shell Oil Company to purchase Firestone TBA products". Nevertheless, Firestone took advantage of Shell's acts of persuasion and integrated its promotion plans with Shell's system.[24] As the Supreme Court commented in the parallel situation in the companion case, "It was for this bundle of persuasion that Goodyear paid Atlantic its commission". (381 U.S. 368, 85 S.Ct. 1506)

Shell contends that the Supreme Court would not have decided *Atlantic* as it did but for the findings showing widespread overt coercion sufficient to convince the Court that Atlantic had indeed abused its power by forcing its dealers to buy sponsored TBA. Making bad matters worse, Atlantic did not contest these findings and Goodyear called no witnesses in defense of the Atlantic-Goodyear plan. On the other hand, Shell denies the use of coercion and insists that there is no substantial evidence to support a finding of coercion; that the evidence, taken in a light most favorable to the Commission, established only isolated complaints by eleven dealers among 30,000 dealers during the relevant period of time. Shell and Firestone produced an array of witnesses, including 127 dealers, who testified in defense of their TBA plan.

It is certainly true that the Supreme Court larded and interlarded its opinion with references to Atlantic's "admitted overt coercive practices". (366, 85 S.Ct. 1498) It is also true, as we see it, that here, although the evidence seems to support the findings as to certain isolated acts of overt coercion, taking the record as a whole the evidence discloses no pattern of overt coercion. These arguments, however, bear on the issue of overt coercion; they do not bear directly on the principal issue, the Company's use of its economic power through the sales commission plan to cause its dealers to buy

24. Shell promotes Firestone and Goodyear TBA in a number of ways. (1) Shell informs these companies when new service stations will be opened and new dealers initiated, enabling the nominee rubber company to start soliciting the new business far in advance of its other competitors. (2) Shell operates dealer training schools and dealer clinics and holds sales meetings where Firestone and Goodyear TBA products are strongly recommended and are invariably used in demonstrations. (3) Because of the tremendous variety of automotive replacement parts, service station dealers, particularly newcomers, need expert advice on inventory. Firestone and Goodyear prepare elaborate inventory guides geared to their TBA. Shell distributes these guides to its dealers carrying Firestone or Goodyear TBA. (4) Shell dealers are authorized to sell TBA to motorists on Shell credit cards on ordinary credit terms or on a six month deferred payment credit plan; however, the dealers may sell *all* TBA, whether sponsored or not, on such credit. (5) Shell representatives and the rubber company representatives participate in advertising and other promotional activities for the sale of TBA. Some promotions are sponsored jointly; some are paid for by Shell alone. The promotion may take the form of an advertising campaign or the distribution of Goodyear or Firestone signs, racks, or window decals to the Shell service stations. (6)

The activity considered most valuable and relied upon to bring fast results is "double-teaming" by salesmen from Shell and Firestone or Goodyear. A Shell salesman supervises 15 or 20 stations. He is Shell's link with its dealers, handling negotiations for lease renewal, rental changes, or other adjustments. The salesmen assist in adjusting complaints of Shell dealers against Firestone and Goodyear and gives merchandising advice to dealers. The Commission's brief characterizes the Shell salesman as the "big brother" of the dealer, although this characterization was used by only one witness and then, perhaps, not with an Orwellian connotation. In any event, when a TBA representative finds difficulty in moving his line to a nominated dealer, he calls upon the Shell salesman to accompany him on his sales rounds. Their joint solicitation makes clear to a dealer Shell's interest in TBA and, to no one's surprise, the team produces excellent results. The Commission contends that the salesmen go beyond the proper limits of salesmanship and promotion by threatening that Shell will not renew leases or will increase the rents or turn down equipment loans or in other ways injure a balky dealer, if dealers do not carry and sell a sufficient quantity of Firestone (and Goodyear) TBA. Shell and Firestone vigorously deny any coercion through threats or otherwise.

sponsored TBA even in the absence of overt coercion.

Shell and Firestone contend that in structure and operation their plan is basically different from Atlantic's and Goodyear's plan. Shell, for example, emphasizes that it does not attempt to allocate TBA by geographical areas. Atlantic sponsored one TBA supplier in half of its marketing area and another TBA supplier in the other half of the area, foreclosing each from the other's territory; Shell sponsors two TBA suppliers throughout its entire marketing area. The evidence, however, shows that each Shell dealer was expected to choose between the two sponsored suppliers to the exclusion of all others. Once the dealer chose one company, the other company did not compete for any part of the dealer's business.

Shell points to certain facts peculiar to *Atlantic-Goodyear* showing beyond a doubt that Atlantic forced Goodyear TBA on unwilling dealers. In late 1950 Atlantic switched from a purchaser-resale plan of selling Lee tires and Exide batteries to a sales commission plan of sponsoring Goodyear and Firestone TBA. Before making this switch, Atlantic conducted a survey of its dealers: 67 percent preferred Lee tires, 76 per cent preferred Exide batteries over competing brands; only 11 per cent preferred Goodyear tires and 4 per cent Firestone tires. Within nine months after the switch, Lee and Exide lost 75 per cent of their Atlantic business. Shell, on the other hand, adopted its sales commission plan in 1940, has not changed its system, has not shifted TBA suppliers, and contends that there is no evidence that the wishes of Shell dealers were ignored. Undoubtedly, Atlantic's switch of suppliers shows that company's economic dominance over its dealers and the use of that power to promote sponsored TBA—to say nothing of anti-competitive effects. No such striking example of abuse of power by an oil company can be found in the *Shell-Firestone* record. But that does not detract from the less spectacular but solid evidence supporting the Commission's finding that Shell used its economic dominance to cause a substantial number of its dealers to purchase sponsored TBA.

C. Third, the anti-competitive effects of the Shell-Firestone system are comparable with those the Commission found in evaluating the Atlantic-Goodyear system. (There is necessarily an overlap between this subsection and the preceding subsection of this opinion.)

In *Atlantic*, by recognizing the effect of the sales commission plan as "similar to that of a tie-in", the Supreme Court simplified the problem of proving market foreclosure. "*Extensive* ["full-scale"] economic analysis of the competitive effect" based on "examining the entire market in tires, batteries and accessories" was unnecessary. Evidence of "economic justification" or "economic benefit" to the parties was immaterial. It was "enough that the Commission found that a not insubstantial portion of commerce" was affected. Nevertheless, in summarizing its position the Court looked to the record. "The short of it" was that Atlantic, with Goodyear's aid, had "marshaled its full economic power in a continuing campaign to force its dealers" to buy Goodyear TBA. " 'The anticompetitive effects' were clear on the record."

In *Atlantic* the Court found that the effect on commerce was not insubstantial where Firestone and Goodyear sales with Atlantic outlets exceeded $11,000,000 in 1955 and $50,000,000 in six years. The comparable figures here are much greater. In 1957 Firestone and Goodyear sales with Shell outlets amounted to $47,000,000; in eight years the sales reached $290,000,000. In 1957 Firestone sales were $6,190,000 to Atlantic's dealers; $21,000,000 to Shell's dealers; $91,300,000 to dealers of all 16 contracting oil companies.

Before this Court the Commission lists certain "highlights of anti-competitive effects".[25] These "highlights" show the

25. Shell dealers understand they are required to purchase sponsored TBA; they believe failure to cooperate may result in franchise termination; Shell dealers

"dramatic and immediate" anti-competitive pressures *on dealers.* "Yet", as the Commission pointed out in its original opinion, "from the point of view of the antitrust laws, it is the devastating competitive effects of the sales commission system *on competitors* of Firestone and Goodyear which raise the most grave questions in this proceeding." (Emphasis added.) It is these destructive effects on TBA competition that submerged the tie-in issue and that most concerned the Commission and the Supreme Court.

As in *Atlantic,* competition was impaired at three levels. (a) Wholesalers and manufacturers of competing brands were foreclosed from Shell's market. Even Firestone dealers who were not authorized supply points were cut off from Shell's outlets. (b) Firestone and Goodyear were excluded from competing with each other after a dealer had selected his supplier.[26] (c) Shell's dealers, who were limited to sponsored TBA were placed at a competitive disadvantage in having to compete with dealers free to stock several brands of TBA.

Neither party has convincing figures on the relative success of the sales commission plan in terms of the amount of Shell business Firestone captured. Shell contends that its direct dealers bought no more than one-third of their TBA from sponsored outlets in 1954 and that this fact alone shows that Shell did not coerce its dealers or cause them to buy sponsored TBA. Shell's statistical method has deep holes in it.[27] And the Com-

generally purchase substantial quantities of sponsored TBA and correspondingly refuse to purchase TBA from nonsupported sources; the purchase of nonsponsored TBA is something "tolerated" by Shell in emergencies; Shell stations generally are identified "Firestone" or "Goodyear"; Shell, Firestone and Goodyear understand that, under the system, Shell is the "customer" or "account" and that its stations will automatically follow; Firestone understands that its only competitor with Shell is Goodyear; Firestone and Goodyear do not compete for the TBA business of a Shell station once it is assigned to the other; Firestone signs contracts with virtually all of the Shell stations assigned to it which have TBA potential; and Goodyear has sold more TBA to Shell stations than has Firestone; intrabrand competitive injury results from the system's requirement that each Shell station may purchase only from its designated supply point.

26. Shell maintains that many stations are "nominated" to serve as supply points of both Goodyear and Firestone. The Commission, however, found that less than ten per cent of the Shell stations with any TBA potential were nominated by both manufacturers. The Commission found also that usually stations are nominated before they are opened, and once one manufacturer secures the nomination the other company will not solicit the dealer's business. Although Goodyear and Firestone are far and away the largest competitors in the replacement tire market, a market known for its keen competition, the record shows that any competi-

tive activity between them is aimed only at influencing Shell to change a nomination.

27. In 1954 Shell sold 2,824,407,000 gallons of gasoline to its service stations and jobbers. During that same year, these outlets purchased $33,798,000 in sponsored TBA from Firestone and Goodyear. By dividing the latter figure into the former, Shell derives $11.97 as a dollars per 1,000 gallons of gasoline figure for sponsored TBA in 1954.

Total sales of tires and tubes from service stations in 1954 were $290,620,000. This volume was sold by 124,548 service stations. In that the Census Bureau listed some 182,000 service stations in 1954, it is indicated that about 57,500 service stations sold no tires and tubes in 1954. Of those that did sell them, the average sales per station was $2,333 in 1954.

In this same year service stations sold $355,202,000 in batteries and accessories. In this case 135,791 stations handled these items indicating that more than 46,000 did not. For the stations which handled batteries and accessories, the average sales per station was $2,616.

Shell adds the figure of $2,333 to $2,616, the sum of which is $4,949. This is purported to be total TBA sales per station. That is, of course, a bastard figure in that its components come from arithmetic divisions which were made with different divisors. Even if it were possible to assume that all stations handling tires and tubes also handled batteries and accessories, this figure would still be a false one. Nevertheless, Shell braves along and divides this figure into the figure repre-

mission's statistics are not free from holes.[28] The Commission could not make up its mind between asserting that there was two-thirds coverage and one hundred per cent coverage. It decided, somewhat uncertainly, that 68 per cent was the share of Shell TBA sales Firestone and Goodyear gained from their arrangements with Shell.

Goodyear and Firestone are chiefly manufacturers and sellers of tires and tubes. Almost 80 per cent of the sponsored TBA sales by both companies constituted sales of tires and tubes. These companies purchased batteries and many other accessories from other companies and sell them under their own brand name in order to have a complete line of TBA to offer to any service station. In 1957 Firestone and Goodyear were responsible for selling 41 per cent of the replacement tires in the country. This market share is particularly impressive when we recognize that Sears, Roebuck & Co. (All State) and Montgomery Ward & Co. (Riverside) together sold another 11 per cent of the national market. Against these figures, Shell's contention that Firestone and Goodyear supplied

senting the average gasoline gallonage per service station in 1954 (137,972 gallons). This division brings it a purported national TBA sales per 1,000 gallons of gasoline of $35.87. By comparing $35.87 with $11.97, Shell is happily able to assert that Firestone and Goodyear supplied ⅓ of the Shell service station market.

Two errors cast doubt on the Shell statistical analysis. Even if we were to close our eyes to the manner in which the average total TBA sales were compiled, the fact remains that the national figures involved only service stations which carried TBA! There is no telling from the statistics offered how many of the stations carried tires alone, how many carried only batteries and accessories, and how many carried a full line of TBA. The figure of $35.87 serves no useful purpose.

If total sales of tires and tubes were added to total sales of batteries and accessories, the total for 1954 would be $645,822,000. Using Shell's figures for the total amount of gasoline sold by service stations in 1954 (25,176,029,000 gallons), we could divide the gallonage total into the TBA volume amount in order to get a nationwide dollar per 1,000 gallon figure, not taking into account the fact that some stations sold no TBA (irrelevant for this analysis unless it can be shown that Shell stations are more likely to handle TBA than non-Shell stations —a fact which is certainly likely but never shown). The resulting figure is $25.65. The figure would possibly be comparable to the $11.97 figure for sponsored TBA were it not for Shell's second basic error. In establishing the sponsored figure, Shell used its total sales to service stations and jobbers. There is no question that much of the gasoline sold to jobbers is not ultimately sold at service stations but is sold to motor fleet owners,

airlines, and other direct purchasers. The $11.97 figure is therefore too low for service stations, but there is no evidence in the massive record to indicate just how low it is.

In summary, we can gain very little positive knowledge from Shell's laborious statistical analyses.

28. The Commission's method of computation involves the comparison of Shell's percentage share in the national gasoline market (sold through service stations) with the share of its sponsored TBA in the national TBA market (sold through service stations). The underlying assumption is that a service station will have TBA potential in relation to its gasoline sales and this assumption is accepted by all parties. The Commission offers 5 per cent as Shell's share in the national service station gasoline market. See Footnote 12. The major error is that it takes into account only the sales to direct dealers and ignores sales through jobbers. This glaring omission indicates that Shell's share in the market is in excess of 5 per cent although it is impossible to estimate to what extent.

At the same time, the Commission offers 3.4 per cent as Shell's sponsored TBA shares in the national service station TBA market. Although there is some indication that some sponsored TBA is sold to non-service station outlets, the division of Shell's sponsored sales volume into the national service station TBA volume would appear to be a warranted statistical method were it not for the fact that the Commission chose to use figures from the year 1947! It thus attempts to compare a percentage from 1947 with one from 1954; the TBA market saw such revolutionary changes during this period that it is impossible to determine the distortion which results from this comparison.

only one-third of the TBA at Shell's stations loses most of its relevancy. Firestone and Goodyear could sell considerably less than 100 per cent of service station TBA to their Shell outlets and still maintain complete dominance in the tire field, the market area in which they are primarily interested. A device which enhances the position of two or three leading TBA suppliers vis-a-vis smaller competitors cannot be defended on the ground that the device was not completely effective. The Commission's and the Court's ultimate concern was with the cumulative danger presented by the "widespread use" of the plans, rather than the relative effectiveness of particular plans.

Indeed, it is not even necessary to show open or veiled threats of cancellation to mark the sales commission plan as anticompetitive. While Shell may not punish dealers for failure to purchase sponsored TBA, there are many ways in which Shell may help its dealers over the course of a long term relationship. It may extend payment periods, extend credit, renew leases without rental increases. All of these are reasons for a dealer to curry favor with Shell. At the very least, Shell's economic position inclines a dealer to purchase sponsored TBA when it costs him no more to do so. But even this intervention into the process of competitive choice has been prohibited. Northern Pac. R. Co. v. United States, supra. As long as Shell's goodwill is worth having, its dealers will purchase sponsored TBA, at least when it costs them no more to do so. Competition in TBA is thus displaced; sales are, in some part, determined not by the market but by oil company favor purchased by Firestone.

### III.

Taking the record as a whole, we reach the following conclusions.

A. Nothing in the record or in *Atlantic* suggests that the case should be remanded to the Commission.

B. We are not impressed by the evidence showing overt coercion. The Commission introduced testimony of eleven ex-Shell dealers purportedly coerced by Shell. All of these dealers mentioned threats of some type but in no instance was a dealer's lease cancelled or was renewal refused; in no instance was a lease rental increased because of recalcitrance in buying sponsored TBA. None of these eleven dealers bought his entire TBA requirements from a sponsored source. The testimony of these eleven witnesses, supplemented by such documentary evidence as was adduced, was not enough to show a pattern or practice of overt coercion throughout Shell's nationwide network of dealers. When we reflect that the Commission had over 10,000 active dealers and over 20,000 former dealers to draw from in producing evidence, we conclude that the record evidence of overt coercion slims to invisibility—even after making allowances for the difficulties in finding dealers, past or present, willing to testify against Shell.

■ Shell produced thirty-two former Shell dealers and ninety-five present dealers to testify that their purchase of TBA was wholly free and uncoerced. Shell bolstered this evidence with testimony of seventeen competing suppliers who said that they had no problem selling to Shell dealers; testimony showing a Shell policy to encourage initiative and independence of the part of its dealers; documents indicating that Shell's official TBA policy, known to dealers, was based on the dealers' freedom to purchase any TBA. It is true that the examiner discredited Shell's witnesses or minimized the effect of their testimony. It is not our province to substitute our judgment for his in this matter. Nevertheless, his failure to mention the mass of countervailing evidence, when taken with the slimness of the evidence upon which he did rely, leaves us with the definite conviction that the record, when taken as a whole, does not support the finding of fact that overt coercion of dealers to buy from sponsored TBA outlets was a prevailing Shell business practice.

C. The lack of testimony showing overt coercion and the affirmative testi-

mony showing that Shell encouraged initiative and independence in its dealers make even more impressive the evidence establishing that the sales commission system is inherently coercive and results in foreclosure of competition in the TBA market. We find it unnecessary to require the Commission to present a precise measure of the system's effectiveness.

The relationship of a major oil company to its service station dealer goes beyond the bigness-littleness antithesis that exists in innumerable contract negotiations and in the operations of a modern, large business.[29] The inherent leverage a major oil company has over its dealers results from the market structure of the industry and the special dependence on the company of the service station dealer (who is usually also a lessee). The classic market factors of price, quality, attractiveness, and whatever enables a retailer to resell goods at a profit are pre-empted by the TBA distribution system superimposed from on high by deus ex machina. A man operating a gas station is bound to be overawed by the great corporation that is his supplier, his banker, and his landlord. When he hears that Shell will benefit from his patronage of sponsored TBA outlets, the velvet glove of request has within it the mailed fist of command. His interest in catering to Shell's sponsorship of certain TBA will be especially strong when the time for lease renewal approaches (once a year) or when a change in rental or commission appears in sight. The run of the mill service station dealer is a man of limited means who has, for him, a sizable investment in his station. Much of the value of that investment is in goodwill attached to the gasoline he sells, the TBA he stocks, and the location of the station where he sells these products. While it is true that it is expensive for Shell to switch dealers, it is far more expensive, in relative terms, for a dealer to lose his station.

The per se doctrine has a charm all its own in antitrust litigation. When a per se rule is applicable in a given situation, businessmen know where they stand. Lawyers, for the government or for private clients, are saved the necessity of building a record bulging with complicated facts, statistical analyses, market data and other formidable economics material. Here, with the proper authorization, the incantation of two words would enable the Court to sweep most of nine volumes of record under the rug. We hold, however, that in the circumstances this case presents the Supreme Court has not yet authorized that incantation.

In the light of *Atlantic* but based on the record as a whole, we conclude that substantial evidence supports the Commission's basic findings. *Within the factual context of this case,* Shell (a) had dominant power over its dealers and (b) exerted that power through natural leverage and through control devices in carrying out its TBA sales commission plan, (c) causing adverse competitive effects on a not insubstantial portion of the TBA market. The Shell-Firestone sales commission system is inherently coercive upon its dealers and innately anticompetitive in its effect. Its precise harm is hard to measure. But here the Commission has shown enough harm, existent and potential, to require the Court to condemn the Shell-Firestone TBA sales commission plan as an unfair method of competition under Section 5 of the Federal Trade Commission Act.

The first four numbered paragraphs of the Commission's orders against Shell and Firestone deal with the sales commission contract and the sales commission system. Those portions of the Commission's orders are affirmed and will be enforced. Since we have found that the record fails to support the Commission's finding that Shell overtly coerced any substantial number of dealers or that there was any pattern of overt coercion

---

**29.** Congress dealt with a somewhat similar situation in enacting a statute to protect automobile dealers from coercive practices of manufacturers. 15 U.S.C. §§ 1221–1225. See The Automobile Dealer Franchise Act: A "New Departure" in Federal Legislation, 52 Nw.U.L.Rev. 253 (1957).

by Shell, we do not approve or affirm paragraphs five and six of the orders, except to the extent that all coercion intended to promote sponsored TBA in accordance with a sales commission plan is prohibited.