The GOODYEAR TIRE & RUBBER COM-
PANY, Petitioner,

v.

FEDERAL TRADE COMMISSION,
Respondent.

The ATLANTIC REFINING COMPANY,
Petitioner,

v.

FEDERAL TRADE COMMISSION,
Respondent.

Nos. 13339, 13340.

United States Court of Appeals
Seventh Circuit.

April 24, 1964.

John F. Sonnett, Mathias F. Correa, New York City, Timothy G. Lowry, Richard Russell Wolfe, Chicago, Ill., David Ingraham, Alan S. Rasch, New York City, for petitioner Goodyear, Wolfe, Hubbard, Voit & Osann, Chicago, Ill., Cahill, Gordon, Reindel & Ohl, New York City, of counsel.

Frederic L. Ballard, Jr., Charles I. Thompson, Jr., Tyson W. Coughlin, Roy W. Johns, Joel L. Carr, Philadelphia, Pa., for petitioner The Atlantic Refining Co., Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., Peterson, Lowry, Rall, Barber & Ross, Chicago, Ill., of counsel.

Alvin L. Berman, J. B. Truly, Asst. Gen. Counsel, F.T.C., Washington, D. C., James McI. Henderson, Gen. Counsel, Lester A. Klaus, for Federal Trade Commission.

Before SCHNACKENBERG, CASTLE, and SWYGERT, Circuit Judges.

SWYGERT, Circuit Judge.

The Goodyear Tire & Rubber Company and the Atlantic Refining Company request a review of the Federal Trade Commission order based upon a complaint

charging a violation of section 5 of the Federal Trade Commission Act [1] and which challenged the legality of distribution of tires, batteries, and automobile accessories (TBA) to service stations under a sales commission agreement between petitioners.

Goodyear is an Ohio corporation engaged in the manufacture, sale, and distribution of rubber products, including tires and inner tubes. It is the largest manufacturer of these products in the United States.

Atlantic, a Pennsylvania corporation, is a major producer, refiner, and distributor of gasoline and other petroleum products. It markets its products in seventeen states along the eastern seaboard.

The complaint issued by the Commission alleged that Atlantic produces and sells petroleum in commerce to wholesale distributors, automobile service stations, and others; that the distributors and retailers, ostensibly independent, nevertheless, are under the domination and control of Atlantic; that Goodyear and Atlantic entered into a sales commission contract whereby Atlantic agreed to promote the sale of Goodyear products, that is, tires, batteries, and accessories (TBA), to Atlantic's distributors and service station dealers located in a part of Atlantic's sales territory; that Atlantic had a similar contract with Firestone Tire & Rubber Company for the balance of Atlantic's territory; and that Goodyear had similar contracts with a number of other oil companies which, like Atlantic, dominate and control their distributors and service station dealers. The complaint further alleged that Atlantic is paid a sales commission by Goodyear and Firestone on their products which are sold by Atlantic's distributors and service station dealers. The complaint charged that by the use of the sales commission agreement and the practices of the two companies thereunder, Atlan-

tic and Goodyear have restrained competition in the sale of TBA, and committed unfair acts and practices proscribed by section 5 of the Federal Trade Commission Act.

The hearing examiner dismissed the complaint against Goodyear, upholding the legality of the sales commission contract, but found that Atlantic had violated section 5 of the act by forcing a substantial number of its dealers to purchase Goodyear TBA. The examiner's order against Atlantic prohibited future actions of coercion.

Both Atlantic and general counsel for the Commission appealed from the examiner's ruling. The Commission sustained the examiner's finding that Atlantic had coerced its dealers to purchase sponsored TBA but held that the coercion was symptomatic of a more fundamental restraint of trade, inherent in the sales commission plan itself. The Commission said that the principal issue raised by the complaint was the legality of the Goodyear-Atlantic contract. It noted, however, that Atlantic had a similar agreement with Firestone and that Goodyear had like agreements with a number of oil companies other than Atlantic.

The Commission determined that the sales commission method of marketing TBA is "a classic example of the use of economic power in one market (here, gasoline distribution) to destroy competition in another market (TBA distribution)." It found that Atlantic, which sells gasoline, has used its economic power over its dealers to cause them to carry substantial amounts of a different product, TBA; also, that the effects of the sales commission system are anticompetitive at the manufacturing, wholesale, and retail levels. It found that Goodyear's manufacturing competitors have been substantially precluded from selling TBA to the Atlantic service stations assigned to Goodyear; that wholesalers

1. Federal Trade Commission Act, § 5(a) (1), 66 Stat. 632 (1952), 15 U.S.C. § 45 (a) (1) (1958), reads as follows:
    "Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are declared unlawful."

of TBA have also been substantially precluded from selling to Atlantic's service stations; that Goodyear wholesalers who are not supply points have been similarly restricted; and that Atlantic service station dealers have been restrained in marketing nonsponsored TBA. Finally, the Commission found that the public has suffered because lack of competition among the service stations' suppliers of TBA has precluded the possibility of price reductions to the consumer.

The Commission based these conclusions on the components of the sales commission system which include advance notice to Goodyear and Firestone of the selection of new dealers by Atlantic, training schools for Atlantic dealers in which Goodyear and Firestone TBA are used in demonstrations, sales solicitation by Atlantic salesmen of sponsored TBA from dealers, double teaming, use of a reporting technique whereby the tire company reports to Atlantic the TBA purchases of each dealer, Atlantic's recommendation to each dealer of a minimum Goodyear or Firestone TBA inventory, and Atlantic's assistance in advertising, and providing credit card facilities for the sale of sponsored TBA.

Upon finding the sales commission system an unfair method of competition, the Commission revised and expanded the examiner's order. The order of the Commission not only prohibits Atlantic from coercing its distributors and dealers to purchase a particular brand of TBA but also forbids its participation in any sales commission arrangement for the distribution of TBA. Further, the order prohibits Goodyear's participation in any sales commission arrangement with Atlantic or any other oil company for marketing its TBA.

Upon a consideration of the record as a whole, we conclude there was substantial evidence to support the Commission's ultimate findings and conclusions and that its order should be affirmed in all respects.

To narrate all relevant facts would extend our discussion unduly; we undertake a summary.

*Atlantic's Operations.*

Atlantic has three major kinds of customers: wholesale distributors, retailers, and commercial accounts; the last class was not involved in the administrative proceeding.

Wholesale distributors maintain their own storage facilities and resell Atlantic's products under its brand names to their retail customers, including service stations. In 1956 there were 236 Atlantic distributors selling to 2,897 service stations.

Retail dealers who purchase directly from Atlantic are of two classes: lessee-dealers, that is, service station operators who do not own their stations; and contract dealers, station operators who own their stations or lease from parties other than Atlantic, or operate garages, grocery stores, and similar establishments. The company had 5,537 direct retail dealers in 1956. Lessee-dealers accounted for approximately thirty-nine per cent of Atlantic's total gasoline sales in 1955 and the contract dealers eighteen per cent.

The usual lease between Atlantic and its lessee-dealers provides for a one year term with automatic renewal from year to year unless written notice is given before the expiration of any term. When the lease is executed the dealer is required to sign an "Eleven Point Lease Letter" which prescribes operational standards for the service station. These include housekeeping, use and upkeep, display, illumination, personnel, hours of operation, services, adequate inventory, sales promotion, prices, and accounting. The standards are enforced by Atlantic through the surveillance of its sales personnel and so-called phantom customer inspectors.

The Commission found that the eleven point letter is an integral part of the lease; that Atlantic at its option may terminate the lease in the event of its breach; and further, if a dealer violates any of the requirements of the letter, he is warned that the lease will be cancelled unless the noncompliance is remedied within fifteen days.

Atlantic adopted a policy in 1953 providing that any lessee-dealer who establishes a two year record of satisfactory operation is eligible for a three year lease. Moreover, Atlantic after 1953 no longer required its dealers to purchase Atlantic products except lubricants. The record shows, however, Atlantic's dealers handle its products exclusively.

In 1956 fifty per cent of the 3,044 Atlantic contract dealers operated service stations; the others operated grocery stores, garages, and similar outlets (outlets other than service stations ordinarily do not handle TBA).

Although contract dealers do not lease their stations from Atlantic, they usually enter into two kinds of agreements with the company, one providing for loans of station equipment and the other for the purchase of a minimum amount of gasoline. The loan agreements for equipment provide that Atlantic will install but the dealer must maintain the equipment (gasoline pumps, storage tanks, signs, compressors, etc.). The agreements ordinarily are for a one year term but may be terminated by notice of either party at the end of the original or any subsequent term. Atlantic may repossess its equipment upon termination of the contract; however, if the agreement is cancelled because of a breach by the dealer, Atlantic requires him to pay both the cost of installation and removal of the equipment or Atlantic has the option to leave the equipment and require him to pay for it.

Atlantic makes the same type of contract with its wholesale distributors for the purchase of gasoline as required of its contract dealers. The company, moreover, reserves the right to change the service stations' source of supply from Atlantic itself to its distributors.

*Goodyear's Operations.*

Goodyear has tire factories in five states. It also has fifty-seven warehouses from which its tires and the accessories it markets are distributed to wholesale and retail outlets. The batteries which Goodyear sells are distributed directly by the companies manufacturing them.

Goodyear operates approximately 500 company owned wholesale-retail stores throughout the United States. It also has more than 12,000 independent franchised dealers as well as a number of unfranchised dealers; both sell at wholesale and retail.

*TBA.*

TBA is an integral part of service station operations. Dealers must carry it in order to give complete service to motorists and to operate their stations at a profit. There are a large number of TBA items available to dealers, and there are constant changes and production developments in TBA of which the dealers must be trained and kept informed. Every major oil company offers some kind of TBA program to give training and advice to its service station dealers.

*Atlantic's Purchase-Resale Plan.*

For a number of years before Atlantic entered into sales commission contracts with Goodyear and Firestone, it merchandised TBA under a plan known as "purchase-resale."

Under this plan the oil company sells to its dealers at wholesale TBA products which it has purchased and warehoused. The products are merchandised either under the labels of various manufacturers or under the oil company's own labels. Atlantic under its purchase-resale plan bought Lee tires from the Lee Tire and Rubber Corporation, Exide batteries from the Electric Storage Battery Company, and various accessories from other suppliers, and sold these products to its wholesale distributors and retail dealers. Between 1948 and 1950 Atlantic's sales of TBA to its distributors and dealers amounted to $22,000,000.

Atlantic became increasingly dissatisfied with the purchase-resale plan. It asserts that outside of the Philadelphia area the ready availability of Lee tires diminished and it could not give good delivery on batteries or keep them properly charged. It asserts further, that its warehouses were unsuited for handling

accessories, and it was difficult to maintain an adequate supply of TBA to meet the demands of its dealers.

In 1948 and 1949 Atlantic conducted a survey of its dealers to determine their preferences of brands, sources of supply, and other aspects of TBA marketing. Sixty-seven per cent of the dealers interviewed preferred Lee tires and seventy-nine per cent preferred Exide batteries over competing brands. Only eleven per cent preferred carrying Goodyear tires and four per cent Firestone. A majority preferred to purchase their TBA from more than one source because of price advantage and variety of brands. Nevertheless, Atlantic, after conducting experiments under sales commission arrangements with both Firestone and Goodyear, entered into sales commission contracts with these companies, effective March 1, 1951, covering its entire marketing area and assigning a portion of its sales territory to each company.

While negotiating the Goodyear and Firestone contracts, Atlantic asked certain battery manufacturers whether they would offer a program similar to that of Goodyear or Firestone. Several manufacturers indicated an interest. However, both Goodyear and Firestone said they would refuse to sell only tires under the sales commission plan and insisted that they be allowed to handle batteries and accessories as well as their own products.

In order to effect the transition to the new plan, Atlantic held numerous meetings with its dealers at which its own representatives and those of Goodyear or Firestone explained the new program. The dealers were told that the plan was a change in company policy; that Atlantic wanted them to carry Goodyear or Firestone TBA rather than Lee tires and Exide batteries and that the switch would be to the dealers' benefit. Letters were also sent to the dealers advising them of the availability of the new TBA program and urging them to take advantage of it. A Goodyear representative commented on the arrangement with Atlantic, "After years of courtship Atlantic and Goodyear have wed," and "We welcome wholeheartedly this merger."

To commence the plan, Atlantic gave Goodyear and Firestone the names of its dealers in their respective territories so that their advertising could be installed at the service stations. Under Atlantic's policy this meant that only Goodyear or Firestone identifications were to be displayed at Atlantic stations. Atlantic salesmen accompanied either by Goodyear or Firestone salesmen contacted the dealers concerning the change-over to sponsored TBA, and Atlantic received progress reports from Goodyear and Firestone. The reports included the names of dealers who refused to permit the installation of Goodyear or Firestone signs.

Within nine months after the sales commission system was inaugurated, Lee and Exide lost seventy-five per cent of their Atlantic sales notwithstanding the dealers' previous indication of a preference for these products. By October, 1951 ninety-seven per cent of Atlantic's New England region dealers and ninety-six per cent of its New York region dealers had signed with Goodyear. Firestone also signed virtually all the Atlantic dealers in its territory.

*The Sales Commission System.*

The sales commission contract between Goodyear and Atlantic and the contract between Firestone and Atlantic are similar. Under the contracts, Atlantic assigned to Goodyear its New England, New York, and Philadelphia-New Jersey marketing regions and to Firestone its eastern Pennsylvania, western Pennsylvania, and southern regions.

By the terms of the Goodyear contract, Atlantic receives a commission on all Goodyear TBA sold to Atlantic dealers in the territory assigned to Goodyear in return for Atlantic's efforts and cooperation in promoting the sale of Goodyear TBA to those dealers. Atlantic's contractual assistance to Goodyear includes continuous efforts, suggestions, and counseling its dealers that they maintain adequate Goodyear stock, joint calls with

Goodyear salesmen upon the dealers, and the institution of a dealer TBA training program.

An important part of the Goodyear contract is the assignment of each Atlantic dealer to a specific supply point designated by the tire company. The supply point is a TBA wholesaler who may be a Goodyear company operated store, a franchised Goodyear dealer, or an Atlantic service station dealer or distributor who at the same time is a franchised Goodyear wholesaler. Atlantic receives ten per cent commission[2] on all purchases of Goodyear TBA made by its retail dealers from the tire company's supply points and seven and one-half per cent on purchases by Atlantic's wholesale distributors.

When Atlantic selects a new retail dealer, at least three separate interviews are held with the applicant at which the sales commission program with Goodyear is explained. The dealer is told that most Atlantic stations in the Goodyear territory are identified "Goodyear" and that it would be to his advantage to carry that company's products. When an applicant is selected but before he is given a lease, he attends an Atlantic training school where extensive discussions and demonstrations of Goodyear TBA are conducted. Atlantic's sponsorship of Goodyear TBA is explained. The prospective dealer is told what Goodyear inventory he should carry and that he should use approved Goodyear signs, decals, and advertising mats. Goodyear is advised of the opening of the applicant's station, and the new dealer is informed of the Goodyear supply point to which he has been assigned.

Atlantic establishes TBA quotas for its dealers which are considered "an agreed upon obtainable objective." Goodyear reports to Atlantic the monthly purchases of its products by each Atlantic dealer. This procedure enables the oil company to check on the dealers' progress in selling sponsored TBA and also serves as an accounting method for ascertaining the sales upon which Goodyear pays Atlantic its commission.

Atlantic salesmen police dealers' contractual obligations with the oil company by contacting the dealers regularly. It is the salesman who makes the initial recommendation whether a dealer's lease or contract is to be renewed. Atlantic salesmen not only promote the sale of their own company's products but also Goodyear TBA; they help plan sponsored TBA promotions, they write up TBA orders, and they check the dealer's books to ascertain whether nonsponsored TBA has been purchased.

Under the sales commission system, the dealers are visited regularly by a Goodyear salesman accompanied by an Atlantic salesman. Goodyear considers "double teaming" an effective means of selling its TBA. This duality of sales effort is continued at dealer meetings by the presence of representatives of the tire company and the oil company.

Atlantic reserves control over the advertising and identification that may be displayed at its service stations. Its policy is that only sponsored TBA identification should be displayed. Moreover, Atlantic credit cards include TBA. From 1951 to 1953 the credit card facility was limited in Goodyear territory to Goodyear TBA.

## I.

The Supreme Court in FTC v. Cement Institute, 333 U.S. 683, 693, 68 S. Ct. 793, 799, 92 L.Ed. 1010 (1948), indicated that the Federal Trade Commission Act grants "the Commission and the courts * * * adequate powers to hit at every trade practice, then existing or thereafter contrived, which restrained competition or might lead to such restraint if not stopped in its incipient stages." The Commission has a latitude of flexibility within which it can restrain any new unfair method of competition

2. Although termed a sales commission contract, the payments to Atlantic are not commissions on sales made by it but are override payments on sales made by Goodyear supply points to Atlantic's dealers.

"which the ingenuity of competitors may devise." [3]

Unfair methods of competition proscribed by section 5 of the Federal Trade Commission Act cannot be classified rigidly into categories of business methods that stifle competition. Labeling at times is more harmful than helpful in formulating conceptions that correspond with reality.

Although petitioners contest the view of the general counsel that the Commission grounded its order on the existence of an illegal tying arrangement, the Commission found that the sales commission system is, *in effect,* such an arrangement. It went on to explain, however, that because of the peculiar features of the system, it did not rest its decision on a "mechanical application of the rule of the Northern Pacific and Osborn cases." [4] The Commission said:

> "The issue here is the legality of respondents' use of a *particular method* of distributing TBA products. Atlantic has sufficient economic power with respect to its wholesale and retail petroleum distributors to cause them to purchase substantial quantities of sponsored TBA even without the use of overt coercive tactics or of written or oral tying agreements, and this power is a fact existing independently of the particular method of distributing or sponsoring TBA used by Atlantic. Determination of illegality in this context requires an evaluation of competitive effects resulting from the sales commission method of distributing TBA used by these respondents."

The heart of this case is the economic power Atlantic possesses over its service station dealers. Ostensibly, they are independent businessmen; but behind the legalistic facade of independence, there exists a servitude caused by the coercive pressures which Atlantic exerts upon its dealers. The keystone of the actual relationship between Atlantic and its dealers is the lease and the equipment loan contract with their short term and cancellation provisions. Without repeating all the components of the relationship, it is evident that the service station dealer is more of an economic serf than a businessman free to purchase the TBA of his choice. We believe the Commission, in evaluating the evidence, correctly found that if a dealer wishes to continue in good standing with the company and retain his lease or contract, it is advantageous that he carry sponsored TBA.

On the issue of coercion the examiner said:

> "It is clear from the record in this proceeding that the Atlantic dealers did not consider the nonforcing letter as giving to them free and unhampered authority and the blessing of Atlantic to handle whatever TBA they might see fit. Both the dealers and the Atlantic salesmen accepted this letter for what it said; namely, that the dealer at the time of the change-over and prospective dealers thereafter had the right to select or reject the TBA sales program offered by Atlantic. The prospective dealer making application for an Atlantic station would not likely reject offhand the program submitted by Atlantic, and such rejection could very well affect his selection as an Atlantic dealer. After a dealer selected a TBA program, the Atlantic salesmen insisted, and saw to it, that the dealer hewed to the line, insofar as the more important items of TBA were concerned. The salesman would be expected to insist upon the purchase of sponsored TBA, as such purchases were reflected in the commission which the salesman received."

He concluded that "coercion and pressure were used [by Atlantic] on a substantial

---

3. S.Rep. No. 597, 63d Cong., 2d Sess. 13 (1914).

4. Northern Pac. Ry. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); Osborn v. Sinclair Refining Co., 286 F.2d 832 (4th Cir. 1960).

number of dealers to induce them to purchase sponsored TBA and to discontinue the purchase or display of nonsponsored items."

The Commission affirmed the examiner's finding of coercion. It said that although the proclaimed policy of Atlantic has been to permit its dealers to carry whatever TBA they choose, the policy in practice is ignored and the dealers "have been orally advised by sales officials of the oil company that their continued status as Atlantic dealers and lessees will be in jeopardy if they do not purchase sufficient quantities of sponsored TBA."

The Commission referred in particular to witnesses representing suppliers competing with Goodyear and Firestone who testified that the dealers responded negatively to their sales efforts because the dealers felt they were required to purchase sponsored TBA. There was evidence that if the dealers purchased nonsponsored TBA, they were told by Atlantic to return it or, in any event, not to display it. There was also testimony that leases had been cancelled or allowed to terminate because dealers had purchased nonsponsored TBA.

Atlantic contends that the finding of coercion is not supported by substantial evidence. It says that the finding rests on the testimony of only thirteen dealers out of more than five thousand; that these isolated instances of "unauthorized" coercion are insufficient to establish a violation of Atlantic's "free choice policy." We disagree. The evidence relating to overt coercive tactics, although not extensive, must be considered with the testimony of the witnesses representing competing suppliers to the effect that the dealers felt that if they did not carry sponsored TBA they risked reprisal. Also to be considered are the policing tactics of Atlantic's salesmen and the surveillance by the so-called phantom customer inspectors. Moreover, it should be noted that the examiner, in considering the testimony of the dealers who testified for Atlantic, recognized that these witnesses "were under considerable pressure because they were naturally interested in not jeopardizing the renewal of their leases."

Atlantic's contention that sporadic reprisals against dealers are an insufficient basis for finding coercion is answered in United States v. Loew's Inc., 371 U.S. 38, 50, 83 S.Ct. 97, 105, 9 L.Ed.2d 11 (1962). There, the Court said:

"Appellants * * * make the * * * argument that each of them was found to have entered into such a small number of illegal contracts as to make it improper to enter injunctive relief. * * * We disagree. Illegality having been properly found, appellants cannot now complain that its incidence was too scattered to warrant injunctive relief."

Atlantic's power to cause its dealers to carry either Goodyear or Firestone TBA does not depend upon overt coercive methods. The totality of facts surrounding the relationship between the oil company and the dealers points to one conclusion: the oil company is able to exert sufficient economic power over its dealers so that for all practical purposes they are required to carry sponsored TBA.

Atlantic says that its influence over its dealers to purchase sponsored TBA short of force, threat, or intimidation is lawful; that it may recommend high quality TBA to its dealers; and that such action serves a legitimate business purpose in the promotion of the sale of gasoline. This would be a persuasive argument except for the dealers' economic dependency upon the oil company. In that setting, recommendation is tantamount to command. Covert practices are as efficient as overt action. Sophisticated methods of pressuring the dealers into carrying sponsored TBA are as effectual as express covenants and open threats.

Osborn v. Sinclair Refining Co., 286 F.2d 832 (4th Cir. 1960), although a private suit under the antitrust laws, dealt with a sales commission contract similar to the one before us. Osborn, a dealer, charged that his lease was cancelled because he had not purchased suf-

ficient quantities of Goodyear TBA. The court of appeals held that an illegal "arrangement or condition," a tie-in, existed between the oil company and its dealers which permitted the plaintiff to recover. Although the court was not specifically concerned with the legality of the Goodyear-Sinclair sales commission contract, it held that, "the Goodyear TBA was tied to the lease and the sale of the gasoline." Chief Judge Sobeloff characterized the arrangement thus:

> "The perniciousness of the imposed tie-in is aggravated by the fact that the defendant [Sinclair] is not even in the business of selling the tied products, but is employing its economic power in the gasoline industry to force his dealers to do business with a supplier in another industry under an arrangement that yields the defendant an extraneous revenue. The defendant in this case goes a step further than the supplier in the usual tie-in case, for here the tied product is not even handled or sold by the defendant, but it farms out to another, for a price, its coercive economic power."

We think this an apt characterization of the Goodyear-Atlantic sales commission system.

It is true that Goodyear's contract with Atlantic in itself has no tying features. Only when the contract is considered contextually with the oil company-dealer relationship and the economic power that Atlantic has over its dealers does its tying feature emerge. Manifestly, the system was designed to exploit Atlantic's created and controlled service station market. The Commission properly, we think, decided that the system integrates Atlantic's economic power over its service station market into the Goodyear TBA distribution system, thus giving Goodyear, for a price, a captive market.

As pointed out in McElhenney Co. v. Western Auto Supply Co., 269 F.2d 332 (4th Cir. 1959), an illegal understanding (such as a tying arrangement) may be implied from a course of dealing between the parties. Here, the tying arrangement *is* the sales commission system operated by Goodyear and Atlantic. In its narrower aspects the system is a tying arrangement because it requires the buyer of one product, the service station dealer who purchases Atlantic gasoline, to buy another line of merchandise, Goodyear TBA. Surrender by the dealer of his freedom to choose between brands of TBA is *per se* illegal if a "not insubstantial" amount of interstate commerce is affected. Northern Pac. Ry. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed. 2d 545 (1958); International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947).

■ Appraising the broader aspects of the system as a tying arrangement, we think the Commission correctly determined that the system injures competition in the distribution of TBA at the manufacturing, wholesale, and retail levels. Interbrand competition for the Atlantic service station TBA market is foreclosed to Firestone in Goodyear's territory and Goodyear is foreclosed from selling to the service stations in Firestone's territory. Moreover, the record substantiates the Commission's finding that suppliers of TBA competing with Goodyear and Firestone are substantially foreclosed from selling their products to Atlantic dealers. Atlantic's service station market is fenced off so as to make it unavailable to both manufacturers and wholesalers of competing brands.

Intrabrand competition is perniciously affected. Restraint results inevitably from the designation of a single supply point for TBA sales to the Atlantic dealer. Other Goodyear wholesalers cannot compete with the supply point dealer for the business of the Atlantic service stations in his territory.[5]

We are convinced that the Commission correctly analyzed the sales commission

---

5. Of the 1,155 independent Goodyear dealers in Atlantic's marketing area, only 128 were acting as supply points for Atlantic service stations.

system and found, in effect, a tying arrangement inherently anticompetitive. It is anticompetitive largely because competition for the business of the individual service station is replaced by competition for the oil company's domination of its dealers.

The Commission found that service stations constitute a large and necessary market for TBA and evaluated the Goodyear-Atlantic sales commission system in relation to Atlantic's seventeen-state service station TBA market. Atlantic has nearly seven thousand service stations in this territory. As of 1955 Goodyear had signed TBA contracts with 2,183 of the 2,248 Atlantic service stations in the eight-state territory assigned it. As of 1955 Firestone had signed virtually all the 4,698 Atlantic stations in the ten-state area assigned it. Goodyear's TBA sales to Atlantic dealers rose from approximately two and one-half million dollars in 1951 to more than five and one-half million dollars in 1955. Firestone's sales to Atlantic dealers increased from $3,243,350 in 1951 to $5,562,936 in 1955. Total Goodyear and Firestone sales under the Atlantic contracts from June, 1950 to June, 1956 was more than $52,000,000. Atlantic's stations constitute 3.4 per cent of the total number of service stations in the United States and it sells 2.5 per cent of the gasoline sold in the nation.

We believe the foregoing facts adequately demonstrate that a substantial amount of commerce has been affected by Atlantic's contracts with Goodyear and Firestone. These facts also demonstrate that Atlantic has sufficient economic power in the gasoline market to restrain a substantial amount of commerce in the service station TBA market within the territory serviced by Atlantic. Therefore, the Goodyear-Atlantic sales commission system is within the "substantiality of economic effect on commerce" test defined in Northern Pac. Ry. v. United States, supra, and Standard Oil Co., etc. v. United States, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949). Cf. Osborn v. Sinclair Refining Co., supra.

## II.

■ Goodyear contends that the provision in the Commission's order prohibiting it from entering into sales commission contracts with any oil company is not supported by substantial evidence. Atlantic makes a similar contention that the order is too broad because it prohibits the oil company's participation in a sales commission arrangement with any TBA supplier.

We think the Supreme Court answered petitioners' contentions in FTC v. Ruberoid Co., 343 U.S. 470, 473, 72 S.Ct. 800, 803, 96 L.Ed. 1081 (1952), when it said:

"Orders of the Federal Trade Commission are not intended to impose criminal punishment or exact compensatory damages for past acts, but to prevent illegal practices in the future. In carrying out this function the Commission is not limited to prohibiting the illegal practice in the precise form in which it is found to have existed in the past. If the Commission is to attain the objectives Congress envisioned, it cannot be required to confine its road block to the narrow lane the transgressor has traveled; it must be allowed effectively to close all roads to the prohibited goal, so that its order may not be by-passed with impunity."

■ Petitioners' contention that the Commission's findings are inadequate and do not meet the requirements of section 8 of the Administrative Procedure Act, 5 U.S.C. § 1007(b), is without merit.

Moreover, we are not persuaded by Atlantic's contention that the hearing examiner, in making his decision, considered evidence outside the record since he heard a similar complaint filed against Firestone and Shell Oil Company; nor are we persuaded by Goodyear's contention that the finding of the violation against it is based on evidence admitted against Atlantic but struck as to Goodyear. While the examiner received evidence concerning both the Firestone-

Atlantic and the Firestone-Shell sales commission contracts, we are satisfied that the findings of both the examiner and the Commission were based on proper and sufficient evidence and that there was no denial of procedural due process.

The Commission's order is affirmed and will be enforced.