**TIRE SALES CORPORATION et al.,
Plaintiffs-Counterdefendants-Appellants,**

v.

**CITIES SERVICE OIL COMPANY,
Defendant-Counterplaintiff-Appellee.**

**TIRE SALES CORPORATION,
Plaintiff-Appellant,**

v.

**CITIES SERVICE OIL COMPANY,
Defendant-Appellee.**

**Nos. 76–1398, 80–1187.**

United States Court of Appeals,
Seventh Circuit.

Heard Sept. 12, 1980.

Decided Oct. 7, 1980.*

Rehearing & Rehearing en banc
Denied Nov. 20, 1980.

* This appeal was originally decided by unreported order on October 7, 1980. See Circuit Rule 35. The Court has subsequently decided to issue the decision as an opinion.

Robert W. Bergstrom, Chicago, Ill., for plaintiff-appellant.

Samuel J. Betar, Paul J. Petit, Chicago, Ill., for defendant-appellee.

** The Honorable Edward Dumbauld, Senior District Judge of the Western District of Pennsyl-

Before CUMMINGS and PELL, Circuit Judges, and DUMBAULD, Senior District Judge.**

CUMMINGS, Circuit Judge.

Plaintiff appeals in No. 80–1187 from the order of the district court granting a directed verdict in favor of defendant on plaintiff's private treble-damage action brought under Section 4 of the Clayton Act (15 U.S.C. § 15) for alleged violations of Section 1 of the Sherman Act (15 U.S.C. § 1) and Section 3 of the Clayton Act (15 U.S.C. § 14) commencing January 1, 1971. Plaintiff appeals in No. 76–1398 from the order of the district court granting summary judgment in favor of defendant on its counterclaim for $42,580.03 plus interest for goods sold to plaintiff in 1970 and 1971. The appeals were briefed and argued together. We now reverse in both No. 80–1187 and No. 76–1398 and remand the case for trial.

I

Plaintiff Tire Sales, an Illinois corporation, was until 1975 a wholesale distributor of tires, batteries and automotive accessories in Evergreen Park, Illinois, on the south side of Chicago. Defendant Cities Service Oil Company (Citgo) is engaged in the production and distribution of petroleum and other products. It markets its gasoline in the Chicago metropolitan area to operators of Citgo service stations who are franchisees or lessees of Citgo and who purchase all their oil and gasoline requirements from Citgo. Citgo provides its dealers with credit card facilities and is responsible for making repairs and improvements on the leased premises.

From 1952 through 1965 plaintiff was a franchisee of Uniroyal, Inc. and sold tires, batteries and accessories (TBA) at retail to individual and commercial accounts in the open market. At the end of 1964, Uniroyal

vania, is sitting by designation.

signed a sales commission agreement with Citgo whereby Uniroyal agreed to pay 7½% commissions to Citgo on sales of Uniroyal tires to independent Citgo service stations. Uniroyal initially attempted to handle and warehouse its own TBA sales to the Citgo stations, but this proved a failure. In 1965, Uniroyal and Citgo therefore asked plaintiff to sell Uniroyal TBA to approximately 50 independent Citgo stations on the south side of Chicago. Plaintiff furnished Citgo and Uniroyal with monthly reports of its sales to those dealers, thus enabling Citgo to calculate what commissions to collect from Uniroyal. Both plaintiff and Citgo representatives would call on those dealers and solicit orders for TBA from plaintiff.

Subsequently, sales commission arrangements similar to the one executed by Uniroyal and Citgo were invalidated as unfair trade practices in violation of Section 5 of the Federal Trade Commission Act (15 U.S.C. § 45). See, e. g., *Atlantic Refining Co. v. Federal Trade Commission*, 381 U.S. 357, 85 S.Ct. 1498, 14 L.Ed.2d 443, Citgo and Uniroyal consequently entered into a new agreement in 1966, giving Citgo a middleman's profit instead of commissions on sales made to its independent service stations. Under the new arrangement, Citgo bought directly from Uniroyal and then informed plaintiff that in order to continue as the authorized TBA distributor for Citgo dealers, plaintiff would have to buy that portion of its TBA from Citgo rather than from Uniroyal. Under a written agreement of August 14, 1967, plaintiff bought from Citgo a quantity of TBA equivalent to the quantity plaintiff sold to Citgo dealers. Citgo received a 7 to 8½% profit on these sales, consisting of the difference between the amount Citgo paid Uniroyal for TBA and the amount for which Citgo sold TBA to plaintiff. Plaintiff and Citgo did business under this purchase-resale arrangement for approximately three years, during which time Citgo representatives continued to promote and monitor its dealers' TBA business with plaintiff.

At the end of 1970, Citgo terminated its agreement with Uniroyal to purchase TBA for resale to Citgo dealers. Accordingly, Citgo could no longer sell Uniroyal tires to plaintiff or take a profit on the sale of tires purchased by plaintiff directly from Uniroyal and sold to Citgo dealers. As a result, Citgo ceased doing business with plaintiff as a TBA distributor and dealt instead with Berry Tire Co. (Berry Tire), a franchised Goodyear dealer. Citgo had purchase-resale arrangements with Goodyear and Firestone as well as Uniroyal. Thereafter, plaintiff's TBA sales to Citgo dealers decreased dramatically. Plaintiff fell behind in its payments to Uniroyal, which in 1972 cancelled plaintiff as one of its franchisees. Plaintiff at that time owed Uniroyal $80,000, which it paid off over the course of the next year. Plaintiff also owed Citgo a similar amount for TBA inventory purchased before the termination of the purchase-resale agreement and running into 1971 according to defendant's counterclaim (par. 2 of R. Item 7). Plaintiff reduced this indebtedness to $42,580.03. From 1971 through 1975, plaintiff's financial situation, then as a Dunlop franchisee, steadily deteriorated and in December 1975 it went out of business.

In 1974, Citgo filed suit against plaintiff to recover the outstanding debt. Plaintiff then filed the present antitrust suit alleging that Citgo conspired with its independent dealers in the Chicago area and with distributors of Goodyear and Firestone tires [1] in the same area to restrain trade, to have tie-in sales in the sale of tires to those stations, to boycott plaintiff, to limit and allocate TBA purchases by Citgo dealers instead to Goodyear and Firestone tires and to TBA distributor Berry Tire and conditioned sale of gas and oil to its dealers on the understanding that they would not purchase TBA from plaintiff or other competitors of Citgo. Plaintiff further claimed that Citgo's allegedly illegal activities caused them $970,000 actual damages or

1. It subsequently developed that Berry Tire was the only distributor involved and that it dealt solely in Goodyear tires. Consequently, any later references to Firestone herein are surplusage. See Reply Brief at 7.

$2,910,000 in treble damages as provided by Section 4 of the Clayton Act. Accordingly, plaintiff sought judgment in the latter amount plus costs and reasonable attorney's fees. Defendant denied these allegations and counterclaimed for $42,580.03, plus interest, as the amount still due under the purchase-resale agreement and in 1971. Plaintiff defended the counterclaim on the ground that no balance was due Citgo because the debt arose as a result of an antitrust conspiracy and illegal tie-in sales.

On March 4, 1976, Judge Grady, to whom this case was then assigned, filed a memorandum order (410 F.Supp. 1222) disposing of the issues raised by the parties' cross-motions for summary judgment. He entered judgment in favor of Citgo with respect to plaintiff's charges of reciprocal dealing, monopolization and attempted monopolization,[2] but refused judgment on a conspiracy to monopolize charge. Plaintiff, however, withdrew this latter charge before trial, and none of the foregoing claims are now in issue. Judge Grady also refused summary judgment with respect to the claims of tie-in sales, group boycott and exclusive dealing in violation of Section 1 of the Sherman Act and Section 3 of the Clayton Act. On these claims, he found that Citgo's position gave it the power to impose TBA tie-in sales on an appreciable number of buyers in the market and that the requisite amount of commerce was "indisputably demonstrated," but that there was conflicting evidence as to whether Citgo's dealers "were induced [by Citgo] to make TBA purchases [from Berry Tire] for reasons other than those which motivate a reasonable buyer in a free market—namely, price, quality, and the like," so that a trial was required to determine whether Citgo's dealers had been illegally induced by Citgo to buy TBA from Berry Tire rather than plaintiff.[3] 410 F.Supp. at 1227–1228.

Finally, Judge Grady entered judgment for Citgo on its counterclaim because the "defense of an antitrust violation is limited to situations where the court would be enforcing the precise conduct condemned by the [Sherman] Act," but stayed the judgment until final disposition of the other issues in the case. 410 F.Supp. at 1232. Thereafter, the plaintiff filed a protective notice of appeal with respect to the judgment against it on the counterclaim. That appeal was assigned No. 76–3198 by the Clerk of this Court.

The trial on the merits began on December 10, 1979, before a jury with Judge McGarr, to whom the case had been reassigned, presiding. On January 9, defendant's motion for a directed verdict at the close of the plaintiff's case was granted and the jury was discharged. On the same date, judgment was entered that the plaintiff take nothing and that the action be dismissed on the merits. In early February, plaintiff filed its notice of appeal and it was assigned No. 80–1187 in this Court.

## II

As noted above, Judge Grady in refusing summary judgment on plaintiff's tie-in sales claim found that a trial was necessary on the question whether Citgo had illegally coerced its dealers to switch their TBA business from plaintiff to Berry Tire. At the close of plaintiff's case at trial, however, Judge McGarr directed a verdict against plaintiff, finding that

(1) there was insufficient evidence to establish a *prima facie* case that Citgo had illegally tied TBA sales to leases or gas supplies;

(2) there was insufficient evidence to establish a *prima facie* case that Citgo had illegally coerced its dealers not to buy from plaintiff after 1971 when Berry Tire was substituted as the authorized dealer; and

---

**2.** Judge Grady found that plaintiff had not shown that Citgo controlled even close to a monopoly share of the relevant market, which he defined as "the wholesale market of TBA on the south side of Chicago." 410 F.Supp. at 1230–1231.

**3.** Judge Grady also held that Citgo's alleged attempts to secure a Goodyear or Firestone distributorship for plaintiff so that it could continue its dealings with plaintiff would not constitute a defense to the antitrust claims. 410 F.Supp. at 1229.

(3) there was inadequate evidence to establish the amount of plaintiff's alleged losses and insufficient evidence to establish that Citgo had caused these losses. (App. 12–14.)

 In our view, the trial court erred in not reviewing the evidence in the light most favorable to the plaintiff and in not giving plaintiff the benefit of all inferences which the evidence fairly supports even though contrary inferences might reasonably be drawn. This standard is compulsory for ruling on a motion of directed verdict (*Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 696, 82 S.Ct. 1404, 1409, 8 L.Ed.2d 777) and the trial court is, of course, not to weigh the credibility of witnesses. *Brady v. Southern Railroad*, 320 U.S. 476, 479–480, 64 S.Ct. 232, 234–235, 88 L.Ed. 239. As this Court has stated, a motion for directed verdict must be denied "where the evidence is such that reasonable men in a fair and impartial exercise of their judgment may draw different conclusions therefrom." *Hannigan v. Sears, Roebuck and Company*, 410 F.2d 285, 287 (7th Cir. 1979). Viewing the record with the foregoing principles in mind, we conclude, with all due respect, that plaintiff was entitled to a jury verdict.[4]

## A. Sufficiency of Evidence of Coercion

The central disputed issue of fact in this case is whether Citgo dealers ceased doing business with plaintiff because they concluded on their own or through legitimate salesmanship efforts by Citgo that plaintiff's products were no longer preferable to those offered by competitors or because Citgo used its economic power to coerce them into doing so. There is no question but that plaintiff has presented evidence that Citgo "pressured" its dealers into switching their TBA business from plaintiff to Berry Tire. This evidence includes, *inter alia*, testimony by two dealers of direct threats of lease cancellations or other repercussions if they didn't go along with Citgo's switch to Berry Tire;[5] testimony by other dealers that they felt they had to go along with the switch to avoid unfortunate reverberations;[6] testimony by a Citgo sales representative that Citgo made it clear to its dealers that they were to switch their business from plaintiff to Berry Tire (Tr. 177–178, 181); a letter from a Citgo sales manager informing Cit-

---

4. In approving the assessment of the plaintiff's evidence contained in Judge Grady's 1976 opinion herein, we are not relying on the law of the case doctrine. Judge McGarr was of course entitled to assess the evidence independently. See *Champaign-Urbana News Agency, Inc. v. J. L. Cummins News Co., Inc.*, 632 F.2d 680, at 683 (7th Cir. 1980).

5. Former Citgo dealer Critchett testified that Citgo salesman Clay showed him a list of Citgo dealers' purchases from Berry Tire and hinted that if Critchett did not also buy from Berry Tire he would not be a Citgo dealer any more (Tr. 70, 84). Critchett also testified that Clay told him that if he expected his employee Raczkowski to be permitted to take over the station, Critchett "damn well better buy from Berry Tire" in the interim (Tr. 78). Citgo dealer Raczkowski testified that after he succeeded Critchett, Clay told him that "the station had to be run the way that the oil company wanted it to be run," that Citgo wanted all the Citgo dealers to do business with Berry Tire and that Raczkowski was supposed to buy his TBA from Berry Tire (Tr. 243). He testified further that in October 1973 Citgo representative Peters told him that Citgo would throw him out unless he bought more TBA from Berry (Tr. 248).

6. Citgo dealer Hafer testified that he started buying TBA from Berry Tire because of "a little coercion" from Citgo even though Hafer would have preferred to continue dealing with plaintiff (Tr. 456, 479–480). Former Citgo dealer Cerny testified that he knew that Citgo was phasing out its stations and that he knew it would be better for him when his lease came up for renewal if he went along with the switch (Tr. 270). Former dealer De Stefano testified that he believed his lease would be cancelled if he didn't switch from plaintiff to Berry Tire. When asked whether anyone from Citgo had threatened his lease, De Stefano replied, "I don't have to be told certain things" (Tr. 320). Citgo dealer Kulovitz testified that a Citgo representative introduced him to a Berry salesman and told him to buy his TBA merchandise from Berry Tire from that day on (Tr. 140). Kulovitz stated on cross-examination that "they didn't put a gun to my head, I'll grant you that," but said he went along with the switch to Berry Tire because "you had to lean towards them [Citgo] or otherwise they could have made it rough" for him (Tr. 147).

go dealers in the area that Citgo would not make available its credit card facilities in connection with the sale of any TBA purchased from its competitors (App. 97); and the ·precipitous decline of plaintiff's TBA business with Citgo dealers following Citgo's decision to switch to Berry Tire (see statistics in Plaintiff's Brief at 23 and Reply Brief 19).

Citgo argues, however, that the trial court apparently found that the evidence offered was insufficient to go to the jury because, even if believed, it did not prove the quantum of pressure necessary to establish coercion that would constitute a violation of the antitrust laws. We disagree. As Judge Grady concluded in passing on the cross-motions for summary judgment:

> "The plaintiff has produced evidence that the defendant coerced its dealers into buying TBA from Berry. Such coercion included threats to cancel service station leases and refusal to make repairs. * * * Even in the absence of overt coercion, dealers may have been induced to purchase from Berry Tire because of the inherent power which the defendant possessed as the company upon which the dealers depended in almost every aspect of their business." 410 F.Supp. at 1227.

> \* \* \* \* \* \*

> "The plaintiff has produced facts similar to those involved in *Texaco* and *Shell*; if believed, they would show that the reason dealers were buying TBA from Berry rather than Tire Sales was that Berry was the defendant's distributor and not because Berry's TBA were inherently preferable." 410 F.Supp. at 1228.

In *Federal Trade Commission v. Texaco Inc.*, 393 U.S. 223, 89 S.Ct. 429, 21 L.Ed.2d 394, Texaco was held to have violated Section 5 of the Federal Trade Commission Act (15 U.S.C. § 45) because the oil company, as a result of the inherent nature of the petroleum distribution system, exercised dominant control over its dealers in inducing them to buy sponsored TBA products. No evidence of overtly coercive tactics was presented in that case. In *Shell Oil Company v. Federal Trade Commission*, 360 F.2d 470 (5th Cir. 1966), certiorari denied, 385 U.S. 1002, 87 S.Ct. 703, 17 L.Ed.2d 541, Shell was on similar facts also held to have violated Section 5 of the Federal Trade Commission Act. Again there was no evidence of overtly coercive tactics, but Shell's economic dominance caused a substantial number of its dealers to purchase Shell-sponsored TBA.

In *Goodyear Tire & Rubber Company v. Federal Trade Commission*, 331 F.2d 394 (7th Cir. 1964), affirmed *sub nom. Atlantic Refining Co. v. Federal Trade Commission*, 381 U.S. 357, 85 S.Ct. 1498, 14 L.Ed.2d 443, this Court held that Atlantic Refining Company violated Section 5 of the Federal Trade Commission Act even though the evidence relating to overt coercive tactics was not extensive but only isolated. In so holding, we stated in language applicable to the coercion issue here:

> "Atlantic's power to cause its dealers to carry either Goodyear or Firestone TBA does not depend upon overt coercive methods. The totality of facts surrounding the relationship between the oil company and the dealers points to one conclusion: the oil company is able to exert sufficient economic power over its dealers so that for all practical purposes they are required to carry sponsored TBA." 331 F.2d at 401.

In short, a "recommendation" in the context of dealers' economic dependency upon an oil company was considered "tantamount to command." *Ibid.*

■ Although the above-discussed cases were not decided under the Sherman or Clayton Acts, they serve to show that the quantum of coercion allegedly exercised here by Citgo was sufficient, unless refuted by Citgo's evidence, to cause its dealers to desert plaintiff for Berry Tire in violation of Section 1 of the Sherman Act and Section 3 of the Clayton Act. Citgo argues in effect that any pressure exerted on dealers to purchase sponsored TBA which falls short of overtly coercive acts, such as actual lease cancellations, is insufficient as a matter of law to establish an antitrust violation. But, as this Court stated in the *Goodyear* case, *supra*:

"Sophisticated methods of pressuring the dealers into carrying sponsored TBA are as effectual as express covenants and open threats." 331 F.2d at 402.

Plaintiff has in fact in this case presented some evidence of overt coercion in addition to evidence of a pattern of covert coercion. Citgo would have us ignore this evidence because it allegedly involved only a few dealers and because Citgo did not make good on its sales representatives' threats to cancel leases. This misses the point. An oil company's threat to cancel a franchisee's lease is overt coercion whether it is ultimately acted upon or not. Similarly, the fact that only a few dealers testified to direct coercion can easily support an inference that other dealers acquiesced in Citgo's switch to Berry Tire without any need for overtly coercive acts because they understood it to be potentially dangerous to rock the boat. The rapidity with which Citgo dealers deserted plaintiff after Citgo's switch to Berry Tire lends further support to such an inference. Cf. *Atlantic Refining Co. v. Federal Trade Commission*, 381 U.S. 357, 368, 85 S.Ct. 1498, 1506, 14 L.Ed.2d 443 ("[T]he most impressive evidence of [the tying arrangement's] effectiveness was its undeniable success within a short time of its inception.").

■ Finally, it is true that much—although certainly not all—of plaintiff's evidence of coercion is circumstantial. It is well settled though that agreements, arrangements or conditions that unreasonably restrain trade by boycotts or tie-ins may be inferred from the circumstances surrounding a course of dealing. *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505; *Osborn v. Sinclair Refining Co.*, 286 F.2d 832, 837 (4th Cir. 1960). We recognize that a jury might decide against plaintiff on the basis of the evidence presented. But viewing the evidence in the light most favorable to the plaintiff, and giving the plaintiff the benefit of all inferences which the evidence fairly supports, we conclude that reasonable persons in a fair and impartial exercise of judgment might also decide that Citgo, the profit-taking middleman, exercised its economic power and coerced its dealers to terminate their TBA business with plaintiff in favor of their new distributor Berry Tire in violation of Section 1 of the Sherman Act and Section 3 of the Clayton Act. See, *e. g., Moore v. Jas. H. Matthews & Co.*, 550 F.2d 1207, 1217 (9th Cir. 1977); *Osborn v. Sinclair Refining Co.*, 286 F.2d 832, 838 (4th Cir. 1960); *Richfield Oil Corporation v. Karseal Corp.*, 271 F.2d 709, 712 (9th Cir. 1959).[7]

B. *Evidence of Proximate Cause Was Sufficient*

■ Citgo contends that its actions did not cause plaintiff's injuries. Plaintiff showed that losses occurred after 1971 when Citgo dropped plaintiff as TBA supplier to its 50 south side dealers in favor of Berry Tire. Plaintiff also showed that sales to Citgo dealers dropped from approximately 90% of its business to an insignificant amount. It may be true, as the trial court found, that some of plaintiff's losses were attributable to other causes as well,[8] but

---

7. *Belliston v. Texaco, Inc.*, 455 F.2d 175 (10th Cir. 1972), on which Citgo relies, is distinguishable. There Belliston's attorney stipulated that Texaco had not engaged in any coercive conduct. Here the existence of coercion is precisely the disputed issue. *Sargent-Welch Scientific Co. v. Ventron Corp.*, 567 F.2d 701 (7th Cir. 1977), certiorari denied, 439 U.S. 822, 99 S.Ct. 87, 58 L.Ed.2d 113, and *Juneau Square Corp. v. First Wisconsin National Bank of Milwaukee*, 624 F.2d 798 (7th Cir. 1980), are inapt. In the former, this Court held in pertinent part that the trial court's verdict against plaintiff after a full bench trial was not clearly erroneous. In the latter case, the issue was whether the trial court had abused its discretion in granting a new trial or committed reversible error in the second trial. Here the question is whether there was sufficient evidence to go to the jury. Moreover, the substantive issues are not on point. *Havoco of America, Ltd. v. Shell Oil Co.*, 626 F.2d 549 (7th Cir. 1980), is also of no help to Citgo. There the complaint was dismissed for failure to allege the requisite anticompetitive effect for a Rule of Reason case. This is not the problem here.

8. The trial court recognized that because of its ruling on the coercion issue, a discussion of proximate cause was unnecessary. It nevertheless went on to state that plaintiff's decline was attributable to the termination of Citgo's contract with plaintiff and the "over-extended

plaintiff is required to show only that Citgo's antitrust conduct "materially contributed" to its injury. *Weiman Co. v. Kroehler Mfg. Co.*, 428 F.2d 726, 729 (7th Cir. 1970). Since by December 1975 the Citgo-Berry Tire arrangement seemingly excluded plaintiff almost entirely from its former market,[9] plaintiff's damages should be based on the sales it would otherwise have made but for the alleged antitrust violations. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 124–125, 89 S.Ct. 1562, 1577–1578, 23 L.Ed.2d 129, Page, *Antitrust Damages and Economic Efficiency: An Approach to Anti-trust Injury*, 47 U.Chi. L.Rev. 467, 486 (1980). And since plaintiff, on the basis of its *prima facie* case, was forced out of business by defendant in December 1975, plaintiff's fair market price would also be recoverable. *Id.* at 486.

### C. *Testimony on Damages Was Adequate*

■ Plaintiff's expert on damages was Dr. Joseph Trosper, Professor of Finance at the University of Indiana. His computations are not challenged by Citgo. The district court found though that Dr. Trosper's testimony was inadequate to establish a *prima facie* case of damages. It objected to Dr. Trosper's estimates first because of the use of 1969 as the base year for profit tabulation when 1970 was the last calendar year of plaintiff's contract with Citgo and because 1969 was one of only two profitable years in a 5-year period. The court also thought the profit figure used by Dr. Trosper for 1969 was questionable because there were three figures for 1969: "a tax return figure, a draft financial statement and an actual financial statement," so that the court could not decide which was the correct base figure to use (App. 10).

We hold that it was permissible for Dr. Trosper to use 1969 as the base year because Citgo was already using Berry Tire instead of plaintiff in the latter part of 1970, thereby making 1970 an abnormal year. Moreover, since plaintiff's gross sales had been increasing progressively in 1967, 1968 and 1969, and since losses in the 5-year period are to some extent attributable to such exceptional events as destruction by a tornado, there were still other reasons to use 1969 to calculate plaintiff's future earnings absent antitrust violations by Citgo from January 1, 1971, when Berry Tire officially replaced plaintiff, and December 1, 1975, when plaintiff closed down. While Dr. Trosper used $16,500.44 shown on plaintiff's financial statement as the net profit on plaintiff's sales in 1969 instead of $10,441.89 shown on plaintiff's loan application to Citgo, the damage computation of $258,947 in lost earnings could be recomputed downward if the jury decided the net profit for 1969 was the lower figure.[10]

The trial court was also unwilling to accept the data which plaintiff's witness used to project growth rate because the companies relied on were not comparable companies with comparable problems and because the data did not take into account the loss of profits that, in the court's view, would have occurred even if Citgo had not engaged in illegal activities (App. 11). But it was permissible for Dr. Trosper to conclude that Citgo's illegal conduct caused plaintiff to lose business because at that point plaintiff's evidence stood uncontradicted. In the absence of statistics for wholesale tire distributors, it was also proper for Dr. Trosper to use a 9% annual growth rate for plaintiff based on the average growth rate of TBA manufacturing companies, which he explained would be approximately the same

financial posture of" plaintiff, which made it impossible for plaintiff to acquire another product line. (App. 8–9.)

**9.** For the years 1971 through 1975, the following table shows plaintiff's and Berry Tire's TBA sales to Citgo independent dealers (Pl. Br. 23–24 and Reply Br. 19):

| Year | Berry Tire | Plaintiff |
|------|-----------|-----------|
| 1971 | $112,379.58 | $140,760 |
| 1972 | 189,632.36 | 72,064 |
| 1973 | 142,564.86 | 84,790 |
| 1974 | 119,906.92 | 51,859 |
| 1975 | 60,568.53 | 22,300 |

**10.** Plaintiff suggests that $16,500.44 is the right figure because the lower one was only for federal income tax purposes.

growth rate as that of their distributors. Indeed, Citgo itself had used a 10% growth factor in projecting plaintiff's sales when considering plaintiff's loan application. We conclude, therefore, that Dr. Trosper's profit damage estimate was properly based and note that in any event alternative theories of damages showing lost earnings of $183,-257.34 and $204,674.01 respectively were advanced by plaintiff but unaddressed by the district court.

■ Finally, Dr. Trosper's computation of $193,718 as plaintiff's December 1, 1970, fair market value absent wrongful deprivation of its customers was based on a 9.25% average capitalization rate for all industry applied to a conservative 5-year average earnings figure of $22,399, reduced by 20% income tax. Since plaintiff would be entitled to "going concern" value if its proof that Citgo destroyed its business is not overcome, this testimony was appropriate for jury consideration. The district court's estimate that plaintiff was over-extended and financially shaky only applies after Citgo replaced plaintiff with Berry Tire. Even Citgo's February 1971 comments on a loan application from plaintiff show that plaintiff's credit experience was "excellent," with no past due balance, and with successful operations from 1952 to 1971 (App. 39–45).

In view of the foregoing, it was erroneous to direct a verdict for defendant on the ground that there was insufficient proof of damages.

### D. *Exclusion of Evidence*

■ Although listed as the third issue on appeal, plaintiff's opening brief scarcely argues (and without any supporting authority) that Judge McGarr should have received in evidence the 1964 illegal sales commission arrangement between Citgo and Uniroyal, giving 7½% commission to Citgo on TBA purchased by its dealers, to show that the June 1, 1966, change to a puchase-resale agreement which gave Citgo a middleman profit of 7 to 8.5% on Citgo's

sales of Uniroyal TBA to plaintiff for resale to Citgo dealers was just a change in form and not in substance.[11] In its reply brief plaintiff relies on Rule 401 of the Federal Rules of Evidence, *United States v. 1,129.-75 Acres of Land,* 473 F.2d 996, 999 (8th Cir. 1973) and Cleary, *Handbook of Illinois Evidence* (2d ed. 1963) 207, to support admissibility.

"Relevant evidence" is so broadly defined in Evidence Rule 401 that the proffered evidence was clearly admissible thereunder. In *1,129.75 Acres of Land, supra,* the Eighth Circuit concluded that it was error for a district judge to keep out evidence of subsequent sales as an aid to determine market value, correctly stating (at 999):

"The law of evidence in federal courts favors a broad rule of admissibility and is designed to permit the admission of all evidence which is relevant and material to the issues in controversy, unless there is a sound and practical reason for excluding it."

Similarly, Professor Cleary's handbook deplores the exclusion of supposedly prejudicial evidence because "all effective evidence is prejudicial in the sense of damaging the party against whom offered * * *."

Despite the above authorities which tend to support admissibility, the exclusion of this evidence was not reversible error because the district judge had discretion to exclude it under Evidence Rule 403 on the ground that its probative value was "substantially outweighed by the danger of unfair prejudice, [or] confusion of the issues * * *." At the retrial, the presiding judge will be free to reassess this proffered evidence and to decide whether it should be excluded under Rule 403.

### III

On March 4, 1976, the court below (Judge Grady) granted summary judgment to defendant on its counterclaim in the amount of $42,580.03 plus interest for goods sold to plaintiff before the Citgo switch from

---

11. In its opening brief, Citgo mentions other "erroneous" exclusions of evidence but does not argue their admissibility nor show them as an issue. Consequently we do not address them.

plaintiff to Berry Tire in late 1970. The correctness of this judgment is before us in appeal No. 76–1398.

Plaintiff does not contest the amount of the judgment but contends it was impossible to dispose of these Citgo batteries and Uniroyal tires because defendant coerced its independent stations to deal with Berry Tire in lieu of plaintiff. The record shows that defendant's credit manager told one of plaintiff's officers that plaintiff's financial predicament "was Citgo's fault and he was not going to push me on payment of this particular indebtedness * * *" (Tr. 1098). Nevertheless Citgo filed a suit to collect this amount in 1974 before this antitrust suit was filed by plaintiff. Defendant renewed the demand in its counterclaim herein.

Defendant relies, as did the district judge, exclusively on *Kelly v. Kosuga*, 358 U.S. 516, 521, 79 S.Ct. 429, 432, 3 L.Ed.2d 475, in support of summary judgment for defendant. There, however, respondent's antitrust conduct did not prevent the petitioner from selling the products (onions) he had purchased from respondent, so that the Court gave effect to respondent's sale of onions to petitioner at a fair price despite the fact that the contract between them was part of an illegal price-fixing scheme. Here, if proved, defendant's antitrust violations did prevent plaintiff from reselling these goods, and plaintiff has not been shown to be *in pari delicto*. Therefore, it was premature to grant summary judgment on the counterclaim until plaintiff's antitrust allegations are finally resolved after a full trial. If the jury decides the Sherman and Clayton Act charges in plaintiff's favor, then defendant should not be permitted to recover on its counterclaim. *Milsen Co. v. Southland Corp.*, 454 F.2d 363, 368 (7th Cir. 1971); *Associated Press v. Taft-Ingalls Corp.*, 340 F.2d 753, 769 (6th Cir. 1965); *Farbenfabriken Bayer, A.G. v. Sterling Drug, Inc.*, 307 F.2d 207 (3d Cir. 1962).

12. Circuit Rule 18 will apply.

* This appeal originally was decided by unreported order on October 8, 1980. *See* Circuit

Judgments reversed in Nos. 76–1398 and 80–1187, and the combined case is remanded for trial.[12]